LEWIS & LLEWELLYN LLP
Marc R. Lewis (Bar No. 233306)
mlewis@lewisllewellyn.com
Kenneth M. Walczak (Bar No. 247389)
kwalczak@lewisllewellyn.com
601 Montgomery Street, Suite 2000
San Francisco, California 94111
Telephone: (415) 800-0590
Facsimile: (415) 390-2127

Attorneys for Plaintiff
ALBERT RICHARDS

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALBERT RICHARDS, | Case No. |
| Plaintiff, | **COMPLAINT** |
| v. | |
| CENTRIPETAL NETWORKS, INC.; ALSOP LOUIE MANAGEMENT LLC; ALSOP LOUIE CAPITAL 2, L.P.; ALSOP LOUIE PARTNERS 2, LLC; HOULIHAN LOKEY, INC.; OCEAN TOMO LLC; STEVEN ROGERS; JONATHAN ROGERS; PAUL BARKWORTH; GILMAN LOUIE; JOSEPH ADDIEGO; WILLIAM CROWELL; CRISTOBEL CONDE; and JOHN DOES 1-10, | |
| Defendants. | |

COMPLAINT
CASE NO.

LEWIS +
LLEWELLYN
LLP

**INTRODUCTION**

This is the second lawsuit filed in this Court by Plaintiff Albert Richards ("Richards") to redress the fraud, breach of fiduciary duty, and other malfeasance committed by Defendants Centripetal Networks, Inc. ("Centripetal"), Centripetal founder and majority owner Steven Rogers, his son Jonathan Rogers, and CFO Paul Barkworth.

The first case addresses the concealment and misrepresentations the individual defendants made to deceive Richards as to the true value of the convertible notes he purchased from Centripetal, and to fraudulently deny Richards multiple opportunities to convert said notes at very attractive terms. It also advances unjust enrichment claims against Steven Rogers, who – as the company's sole Board Member at the time – granted himself an excessive number of options in an attempt to maintain his majority control of the company. *See Richards v. Centripetal et al.,* N.D. Case No. 4:23-CV-00145-HSG ("*Richards I*").

This second action concerns i) Centripetal's actions depriving Richards (and other Series A-2 Preferred shareholders) of valuable warrants that were instead granted to a single Series A-2 investor in violation of the Stock Purchase Agreement, and ii) the fraudulent "squeeze-out" merger engineered by the same Defendants in the California action, plus outside investor Alsop Louie Partners LP ("Alsop Louie") and valuation firms Houlihan Lokey and Ocean Tomo, to deprive Richards of the rights and returns he was owed as a Series A-2 preferred shareholder in Centripetal.

In total, Richards invested $1,000,000 in Centripetal, $500,000 in Series A-2 preferred shares purchased in 2014 and another $500,000 in convertible notes, these purchased in late 2015 and early 2016. At the time, Centripetal was a start-up cybersecurity company with significant cash needs, and Richards invested in this high-risk venture based on the opportunity to potentially earn extraordinary returns in exchange for assuming the associated risks. Instead, Richards found himself enmeshed in a company that – at seemingly every turn – attempted to deprive him and his fellow investors of the benefits associated with their purchases.

Centripetal's fraudulent withholding of warrants owed to the Series A-2 shareholders occurred in early 2016, but Richards didn't discover the malfeasance until he performed a detailed analysis of Centripetal's financials in mid-2022—specifically in reaction to Centripetal's

LEWIS +
LLEWELLYN LLP

malfeasance in the squeeze-out merger.  Centripetal's initial offering of Series A-2 preferred shares in 2014 and 2015 had not gone as well as the company had hoped, and thus in early 2016 warrants were added to the offering in the hopes of generating more interest and additional investment.  As part of this change, existing Series A-2 shareholders (including Richards) were also promised warrants – due to a clause in the Stock Purchase Agreement thar required all investors to be treated equally.  The "sweetened" deal also met with a tepid response, and Centripetal closed the offering in mid-2016 after the company instead found funding in the form of a $3 million convertible note.  That "closing", however, was ***after*** one investor had purchased $1 million of Series A-2 preferred shares at the sweetened terms—thereby obligating Centripetal to deliver the promised warrants to the other Series A-2 shareholders.  However, rather than honoring this obligation, Centripetal hid the warrant issue in its financial statements so as to avoid the express obligation to Richards and the other existing Series A-2 shareholders.

Then in February 2022, Defendants conspired to engineer a merger under which Centripetal Networks, Inc. became a wholly owned subsidiary of a holding company, CNI Holdings, Inc.  As part of that merger, the individual defendants forced Richards (and other Series A-2 shareholders) to either sell their shares of Centripetal at an artificially-low price or exchange them for much less valuable common shares—on a one-for-one basis, and in exchange for no additional consideration whatsoever.

The merger itself was a complicated transaction where no complication was needed.  Centripetal could have easily offered existing preferred shareholders the buyout price as a share buyback, without all of the complications of the merger.  Those preferred shareholders who did accept the price would have been no better or worse off (ignoring any "side" deals that appear to have occurred).  Instead, Centripetal's two Board Members, Steven Rogers and his son Jonathan Rogers, conspired with Alsop Louie, Houlihan Lokey, and Ocean Tomo to create a deal that deprived other preferred shareholders of their preferred rights, for their own enrichment.

Hallmarks of fraud permeated the merger process.  The two Rogers defendants were the only company Directors—Steven Rogers became the sole director after the mass resignation of the rest of the Board in late 2016, and his son Jonathan was added more recently.  Steven Rogers also

LEWIS +
LLEWELLYN
LLP

1  controlled 60% of Centripetal's shares, with his majority control in the future assured by his ill-

2  gotten options (as described in *Richards I*).  The deal was based on a purported "expert" analysis by

3  the firm Houlihan Lokey that: (a) was prepared at the sole behest of the conflict-ridden Rogers

4  defendants; (b) was clearly labeled "Draft – For Discussion Purposes Only"; (c) relied solely on

5  management inputs—*i.e.*, projections supplied by those same Rogers defendants; (d) valued the

6  entire company at **half** the **amount of insurance** Centripetal had on a patent claims against Cisco

7  Systems, (e) utilized a questionable valuation methodology with virtually no value given to other

8  valuable patent claims and virtually no value to ongoing licensing revenues.

9      Ocean Tomo then provided a "fairness opinion" relating to Houlihan Lokey's analysis was

10  then provided that looked only at the price offered, not on the part of the transaction where preferred

11  shares were converted into common shares for no compensation (and, again, relied exclusively on

12  the Rogers defendants' highly suspect projections).  Tellingly, a separate analysis prepared at the

13  behest of investment firm Option3, just a few months earlier, valued Centripetal at $2-$6 billion,

14  many times higher than Houlihan Lokey's $340 million estimate.

15      Meanwhile, Defendants deliberately withheld other key information that would have enabled

16  Richards to make an informed decision as to whether or not to accept the share exchange.

17      Finally, the Centripetal defendants used coercion and/or conspiracy to procure Alsop Louie's

18  votes to approve the squeeze-out merger.  On September 14, 2021 Centripetal filed a lawsuit

19  advancing ten causes of action against another Alsop-Louie-funded company, LookingGlass Cyber

20  Solutions, Inc. ("Looking Glass"), alleging numerous patent violations by LookingGlass, breach of

21  fiduciary responsibility and breach of confidentiality by Gilman Louie (an Alsop Louie partner who

22  was formerly a Centripetal Board Member but who was then the Chairman and CEO of

23  LookingGlass), and breaches of duty and aiding and abetting by Alsop Louie.  Centripetal

24  mysteriously dismissed its case in December 2021—before any Answer was even filed.

25      Around the same time, former Centripetal Board Member Cristobal Conde was allowed to

26  convert a $750,000 note into Series A-2 shares at a price of $0.8749 per share—in spite of the fact

27  that: (a) no conversion event had occurred; (b) the Series A-2 round was closed, and reopening it

28  required "mutual consent" of both the company and existing A-2 shareholders; and (c) a much

COMPLAINT
CASE NO.

LEWIS + LLEWELLYN LLP

1   higher price buyout of the Series A-2 shares was imminent.

2        By forcing through the fraudulent "squeeze out" merger and eliminating Richards's preferred

3   stock and its associated rights, as well as eliminating a "Major Investor" that provided considerable

4   company oversight, Defendants breached their fiduciary duty, violated federal securities laws, and

5   violated Delaware and California statutory and common law.

6                    **THE PARTIES, JURISDICTION, AND VENUE**

7        1.        Plaintiff ALBERT RICHARDS is a 30-year veteran of the financial services industry,

8   and the founder and Chief Executive Officer of Alambic Investment Management, LP.  He resides

9   in, and his principal place of business is in, Belvedere, California.

10       2.        Defendant CENTRIPETAL NETWORKS, INC. is a cybersecurity company with its

11  headquarters in Reston, Virginia.   Centripetal has purposefully availed itself of the benefits of doing

12  business in the State of California, including by conducting business with Richards and other

13  California-based investors.  This controversy arises out of Centripetal's contacts with Richards in

14  California.  Centripetal has not contested this Court's personal or subject matter jurisdiction in

15  *Richards I.*

16       3.        Defendant ALSOP LOUIE MANAGEMENT LLC is a Delaware limited liability

17  company with its headquarters located at 943 Howard Street, San Francisco, California 94103. On

18  information and belief, Alsop Louie Management is the corporate parent for Alsop Louie Capital 2,

19  L.P. and Alsop Louie Partners 2, LLC.

20       4.        Defendant ALSOP LOUIE CAPITAL 2 LP is a Delaware limited partnership with its

21  principal office at 50 Pacific Avenue, San Francisco, California 94111.

22       5.        Defendant ALSOP LOUIE PARTNERS 2 LLC is a Delaware limited liability

23  company with its principal office at 943 Howard Street, San Francisco, California 94103.  Alsop

24  Louie Partners 2, LLC. is the general partner of Alsop Louie Capital 2, L.P.

25       6.        The three Alsop Louie entities are referred to three collectively hereafter as "Alsop

26  Louie."  Alsop Louie was the sole Series A investor in Centripetal.  Alsop Louie invested in 2012

27  and had the right to appoint one director to Centripetal's Board of Directors.

28       7.        Defendant HOULIHAN LOKEY, INC. is an investment banking company based on

LEWIS +
LLEWELLYN LLP

Los Angeles, California.  According to its website, "Houlihan Lokey is a leading global investment bank with expertise in mergers and acquisitions, capital markets, financial restructuring, and valuation."

8.      Defendant OCEAN TOMO is a limited-liability corporation based in Chicago, Illinois, with an office in San Francisco.  Ocean Tomo bills itself as an expert in valuing intangible assets and performing business valuations generally.

9.      Defendant STEVEN ROGERS is the founder and majority owner of Centripetal. Steven Rogers has purposefully availed himself of the benefits of doing business in the State of California, including by conducting business with Richards and other California-based investors. This controversy arises out of Steven Rogers's contacts with Richards in California.  Steven Rogers has not contested this Court's personal or subject matter jurisdiction in *Richards I*.

10.     Defendant JONATHAN ROGERS is the Chief Operating Officer of Centripetal, and Steven Rogers's son.  From July 2015 to June 2017, Jonathan Rogers was the Vice President of Operations for Centripetal, and from May 2010 to July 2015, he was the company's Chief Financial Officer.  At other times relevant to this complaint, he was Jonathan Rogers has purposefully availed himself of the benefits of doing business in the State of California, including by conducting business with Richards and other California-based investors.  This controversy arises out of Jonathan Rogers's contacts with Richards in California.  Jonathan Rogers has not contested this Court's personal or subject matter jurisdiction in *Richards I*.

11.     Defendant PAUL BARKWORTH was Chief Financial Officer of Centripetal from June 2015 to August 2022, a time period that encompasses the vast majority of the financial improprieties outlined in this complaint.  According to his LinkedIn profile, Barkworth remains a "Non Executive Financial Officer" of Centripetal.  Paul Barkworth has purposefully availed himself of the benefits of doing business in the State of California, including by conducting business with Richards and other California-based investors.

12.     Defendant GILMAN LOUIE is a partner at Alsop Louie, a position he has held since February, 2006.  Upon information and belief, he was a Board Member at Centripetal from 2014 until May of 2015.  He joined the Board of LookingGlass in 2012, and became Chairman and Chief

LEWIS +
LLEWELLYN
LLP

1  Executive Officer in October of 2020.  Gilman Louie has purposefully availed himself of the

2  benefits of doing business in the State of California, including by conducting business with Richards

3  and other California-based investors.

4         13.     Defendant JOSEPH ADDIEGO was selected by Alsop Louie to replace Gilman

5  Louie on the Centripetal Board.  He joined the Board in May 2015.  Joseph Addiego has

6  purposefully availed himself of the benefits of doing business in the State of California, including by

7  conducting business with Richards and other California-based investors.

8         14.     Defendant WILLIAM CROWELL was Board Chairman and a member of

9  Centripetal's Board of Directors.  Upon information and belief, he joined the Board in 2012 and he

10  remained Board Chairman until his resignation in September of 2016.  He is a Partner at Alsop

11  Louie Partners, a position he has held since July of 2012.  William Crowell has purposefully availed

12  himself of the benefits of doing business in the State of California, including by conducting business

13  with Richards and other California-based investors.

14         15.     Defendant CRISTOBEL CONDE is the former President and CEO of SunGard.  He

15  joined the Centripetal Board in early 2014 and remained a member until his resignation in

16  September of 2016.  Cristobel Conde has purposefully availed himself of the benefits of doing

17  business in the State of California, including by conducting business with Richards and other

18  California-based investors.

19         16.     Defendants JOHN DOES 1-10 are others involved in the unlawful and improper

20  activities described in this Complaint.  The true names or capacities, whether individual, corporate,

21  or otherwise, of these persons are unknown to Richards.  Consequently they are referred to as John

22  Does 1 through 10.  Richards will seek leave to amend this complaint to show the unknown Doe

23  Defendants' true names and capacities when they are ascertained.

24         17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 over

25  Plaintiff's claims under federal statutes and regulations, and diversity jurisdiction pursuant to 28

26  U.S.C. § 1332 over the claims Richards, a citizen of California, raises against individuals or entities

27  based in states other than California.  The amount in controversy far exceeds $75,000, exclusive of

28  interest and costs, as set forth in the ensuing allegations.  The Court has supplemental jurisdiction

LEWIS +
LLEWELLYN LLP

1 pursuant to 28 U.S.C. § 1367 over the state law claims.

2   18. Venue is properly laid in this District under 28 U.S.C. § 1391(b)(2) because a

3 substantial part of the events or omissions giving rise to the claim occurred in San Francisco.

4 <b><u>FACTUAL ALLEGATIONS</u></b>

5 <b>Richards Purchases $500,000 in Centripetal Series A-2 Preferred Shares</b>

6   19. In June 2014 Richards bought $250,000 in Series A-2 preferred shares of Centripetal.

7 In September 2014 he bought an additional $250,000 of Series A-2 preferred shares, raising his

8 equity investment to $500,000.[1]

9   20. This equity stake created a fiduciary relationship between Richards and the Directors

10 and Officers of Centripetal, including many of the Defendants.  As a provider of seed money who

11 was slated to share in the corporation's success, Richards was owed a fiduciary duty by each

12 Defendant.

13 <b>Richards Purchases Two Convertible Promissory Notes for $250,000 Each</b>

14   21. In late 2015 Centripetal was short of funding, because a proposed B-Round of

15 financing from cybersecurity private equity firm Option3 was delayed.  To ease this funding

16 shortage, Richards bought a Convertible Promissory Note dated December 23, 2015 for $250,000.

17   22. Richards purchased a second Convertible Promissory Note dated April 12, 2016

18 (Exhibit B), again for the sum of $250,000.  The terms of the second Note are identical to the first,

19 including the Maturity Date.[2]  This brought Richards's total investment in Centripetal to $1,000,000,

20 $500,000 in Series A-2 Preferred Stock and $500,000 in Convertible Notes.

21 <b>Centripetal Defrauds Richards by Denying Him Opportunities to Convert His Notes Upon the</b>

22 <b>Occurrence of Triggering Events</b>

23   23. Richards's complaint in the Northern District of California concerns Centripetal's

24

25 [1] Both of these investments were made through the Kawishiwi Partners Revocable Trust, a
revocable trust set up by Richards and his wife, Roxanne Richards – both of whom are Trustees.

26 [2] Both Notes state that they have been purchased by "Millennium Trust Company, LLC, Custodian,

27 FBO: Albert Richards, Roth IRA."  Millennium Trust is simply the financial institution where
Richards keeps the Roth IRA account used to purchase the Notes.  Richards was the owner of both

28 Notes; Millennium Trust facilitated the purchase, as custodian of the IRA funds.

LEWIS +
LLEWELLYN LLP

actions, and those of individual defendants Steven Rogers, Jonathan Rogers, and Paul Barkworth, to defraud Richards by failing to notify him upon the occurrence of triggering events, and by withholding material information, or providing false and misleading information, about the financial condition of Centripetal. The Second Amended Complaint in that action spells out those actions in detail. *See Richards v. Centripetal et al.,* N.D. Case No. 4:23-CV-00145-HSG, Docket No. 53.

24.     The following allegations, showing corporate malfeasance in every single year leading up to 2022, provide additional historical context for the fraudulent "squeeze out" merger.

### Centripetal's Initial Fundraising

25.     Centripetal's first major fundraising occurred in 2012, when it issued 16,038,492 shares of Series A Preferred Stock at a price of 24.94 cents per share, for a total investment of $4,000,000. That entire issue of stock was purchased by a fund managed by Alsop Louie Partners ("Alsop Louie"). The issuance was authorized in the Amended and Restated Certificate of Incorporation ("COI") of June 6, 2012, and Authorized Common Shares were also increased to 75,000,000, which included room to accommodate an eventual Series A Preferred Stock conversion.

### 2013 Fundraising and the Series Notes

26.     Centripetal funded its 2013 cash needs with an issue of $3,495,000 in convertible notes (the "Series Notes").

27.     Key terms of the Series Notes included a conversion feature in Clause 2, which states (in part):

> 2. In the event that the Company issues and sells shares of a new series of its preferred stock (the ***"Equity Securities"***) to investors (the ***"Investors"***) on or before June 1, 2016 (the ***"Maturity Date"***) in an equity financing with total proceeds to the Company of not less than $6,000,000 (excluding the conversion of the Notes and other debt) (a ***"Qualified Financing"***), then, at the option of the Holder, (a) the outstanding principal balance of this Note will convert in whole into such Equity Securities sold in the Qualified Financing … (emphasis in original)

28.     Further in Clause 2 the price of this optional conversion was set, for the note principal, at a 20% discount to the price of the financing with a maximum capitalization of $75 million. Meanwhile any accrued interest would convert into the same shares of preferred stock, but

COMPLAINT
CASE NO.

LEWIS +
LLEWELLYN
LLP

1  at the price paid by other investors in the Qualified Financing.

2      29.    In addition to the option to convert, the Series Notes had an ***automatic*** conversion

3  into equity at maturity, described in Clause 3, which states (in part):

4          30.    If the Company has not consummated a Qualified Financing by
           the Maturity Date, the outstanding principal balance of this Note shall
5          automatically convert in whole without any further action by Holder
           into shares of a new series of the Company's preferred stock at a per
6          share conversion price equal to the average of (i) $0.2494, and (ii) the
           fair market value as of the Maturity Date of a share of the most senior
7          preferred stock of the Company … and any unpaid accrued interest on
           this Note shall be repaid in cash on the Maturity Date.
8

9      31.    While the Series Notes had an optional conversion feature, the fact that the principal

10  automatically converted into equity at maturity meant that it could be classified as Equity under

11  generally accepted accounting principles (GAAP).  However, the fact that accumulated interest did

12  not automatically convert into equity at maturity, but would instead be paid in cash, suggests that

13  this should be accounted for as debt and not equity.

14      32.    The Series Notes were also subject to a Note Purchase Agreement, dated October 31,

15  2014.  The Recital in this note limited the total amount that could be issued as follows:

16          To provide the Company with additional resources to conduct its
           business, the Purchasers are willing to loan to the Company in one or
17          more disbursements up to an aggregate amount of $6,000,000 (the
           "Maximum Amount"), subject to the conditions specified herein.
18

19      33.    Purchasers of the Series Notes were Alsop Louie Capital 2 LP [3] ($1,000,000 on July

20  12, 2013), Covant Centripetal Partners LLC[4] ("Covant", $1,495,000 on August 21, 2013), Board

21  Member Cristobal Conde ($500,000 on September 11, 2013) and New York City Investment Fund,

22  LLC ("NYCIF", $500,000 on September 12, 2013).

23      34.    In addition to being a Director of Centripetal, Cristobal Conde is an "Executive-in-

24  Residence" at the Fintech Innovation Lab, upon information and belief a program run by the

25  ─────────────

26  [3] Upon information and belief, Alsop Louie Capital 2 LP is a pooled investment vehicle managed by
    Alsop Louie Partners – for which the latter earns both a management fee and an incentive allocation
    based on the profits of the pooled vehicle.
27

28  [4] On information and belief, Covant is a special purpose vehicle.  Plaintiff is unaware of whether
    Covant has any connection with Centripetal and its Board ,aside from being an investor.

9

LEWIS +
LLEWELLYN
LLP

1  NYCIF.

2  **Centripetal's 2014 Fundraising**

3       35.    Throughout 2014 (and earlier) Alsop Louie had two representatives on Centripetal's

4  Board, William Crowell (Chairman) and Gilman Louie.  In May 2015, Joseph Addiego (another

5  Alsop Louie representative) replaced Gilman Louie on the Centripetal Board.

6       36.    By early 2014, Centripetal was spending approximately $1,500,000 per quarter and it

7  again needed more cash.

8       37.    In Q1 of 2014, upon information and belief, Centripetal raised a further $1,150,000

9  by selling more Series Note investments (including investments from a Board Member, a Company

10  Advisor, and a single outside investor), but this did not cover the first quarter's cash shortfall.  That

11  brought the total amount of Series Notes outstanding to $4,645,000.  In mid-2014, Centripetal

12  conducted a Series A-2 preferred stock offering.  The planned size of this offering changed over

13  time.  A Certificate of Incorporation Amendment of June 12, 2014, authorized 5,714,939 Series A-2

14  shares, this representing a potential investment of $5,000,000 based on the stated conversion price of

15  $0.8749 per share, and Authorized Common Shares were increased to 83,000,000, presumably

16  partly to accommodate future conversions of the Series A-2 shares into common shares.

17       38.    The first $1,000,000 in sales of these shares, upon information and belief, all

18  occurring in June of 2014, were to Board Members Conde ($500,000) and Sophia Corona

19  ("Corona", $250,000) and company advisor David Goone ("Goone", $300,000).[5]

20       39.    The authorized size of the Series Note offering, *i.e.,* $5,000,000, was just short of the

21  $6,000,000 trigger in the Series Notes – a trigger which, if hit, would allow the Series Notes holders

22  the option of converting into the new issue at a 20% discount.

23       40.    Perhaps as a result of the above, Centripetal offered existing Series Noteholders the

24  option of converting into the Series A-2 preferred shares, albeit not at the 20% discount.  Thus, on

25  September 9, 2014, the company again amended the COI, this time increasing the authorized

26  number of Series A-2 Preferred Shares to 12,572,866 ($11,000,000 at a conversion price of $0.8749

27  _____

28  [5] An SEC Form D, filed belatedly in mid-2016, lists the "date of first sale" for the Series A-2
    Preferred Shares as June 12, 2014.

LEWIS +
LLEWELLYN LLP

per share), with the $6,000,000 increase designed to accommodate the conversion of the entire authorized amount of the Series Notes to Series A-2 Preferred Shares.[6]  At this point there was $5,965,000 in Series Notes outstanding, this relative to the $6,000,000 cap on the issue size.[7]

41.      Centripetal raised an additional $1.32 million in Series Notes from Covant in Q3 2014, causing the total amount of Series Notes issued and outstanding to reach $5,965,000, just $35,000 short of the $6,000,000 cap on the issue.

42.      Also in Q3 2014, an additional $750,000 was raised through the sale of additional Series A-2 Preferred Shares, consisting of $250,000 from Rob Slaymaker ("Slaymaker", a friend and business partner of Richards) and $500,000 from Richards's two investments, and bringing the total amount raised from the Series A-2 Preferred Shares to $1.75 million.

43.      In September 2014, Centripetal offered existing Series Note holders the option to convert their notes into Series A-2 shares.  Most *inside* investors, including Alsop Louie, elected *not* to convert.  Centripetal was having funding issues at that time, and by not converting, those noteholders preserved their "most senior creditor" status in the event of a declared bankruptcy.

44.      Investors who did convert their Series Notes into Series A-2 Preferred Shares included company advisor David Goone (who, upon information and belief, left his company advisor position in late 2014 or early 2015), Covant, and two small outside investors.  A total of $3,465,000 in par value of these notes were converted, which resulted in $3,536,413 worth of Series A-2 shares being issued once accrued interest was added.

45.      Nonetheless, Steven Rogers falsely stated by email on September 9, 2014 that: "We have gotten everyone to convert (from the previous $6 mm convertible note) into the A-2."  In reality, $2,500,000 of Series Notes (based on original principal), mainly owned by Alsop Louie and Centripetal Board Members, had *not* been converted.

46.      In the same email, Steven Rogers also misrepresented the success of the Series A-2

---

[6] Technically, this increase in authorized capital was somewhat undersized given that Centripetal offered to convert both principal *and accrued interest* into new A-2 shares.

[7] A somewhat-contradictory SEC Form D, filed belatedly in mid-2016, instead states a total of $9,000,000 was authorized for this issue.

LEWIS +
LLEWELLYN LLP

offerings, stating there was only "a little bit left on the A-2, about $500k".  (Steven Rogers then offered these remaining shares to existing investors, including Richards.)  In fact, Centripetal was at that time $3,250,000 short of its original $5,000,000 goal of selling A-2 shares to new investors (i.e., less than half of the desired amount)

47.     Thus, through the first three quarters of 2014, Centripetal raised approximately $4,220,000, a figure that appears to have been somewhat short of the company's cash burn of the period.

48.     Centripetal's financial situation appears to have worsened in Q4 of 2014, as it raised only $500,000 from the sale of new Series A-2 Preferred Shares (to Saratoga Associates), while Centripetal's cash needs remained near $1,500,000 per quarter.

49.      Because of this cash crunch, Centripetal turned back to Alsop Louie, which bought an additional $500,000 of the Series Notes on October 31, 2014.[8]  That investment, combined with the various conversions, meant that there were $3,000,000 in Series Notes outstanding at the end of 2014, primarily owned by company insiders.

50.     Even with this additional investment, Centripetal's cash on the balance sheet decreased by $1,059,378 over the course of 2014.  Thus, despite raising more than $5,000,000 in capital over the course of 2014 (including Alsop Louie's late-year Series Note purchase), Centripetal finished the year with less than $275,000 in the bank.

**Centripetal Extends the Series A-2 Round and Raises $2,000,000 in Q1 2015**

51.     According to the Series A-2 Stock Purchase Agreement, the offer to purchase A-2 shares closed on "October 12, 2014 or at such later time as the Company and the Purchasers ***may mutually agree***" (emphasis added).  Needing additional cash, Centripetal extended the closing date into 2015, with J. Rogers informing Richards of this fact in an email on February 4, 2015: "We did extend the term for additional closing under the Series A-2, but did not increase the authorized

---

[8] It is unclear if this was another Series Note or if it was some type of modified note.  Technically there was only $35,000 in capacity left on the notes, even though some $3.465 million had been converted into Series A-2 preferred shares, because the $6,000,000 limit in the NPA states that the limit was calculated by summing the "disbursements up to an aggregate amount of $6,000,000", with no offset for future redemptions.

LEWIS +
LLEWELLYN
LLP

1  shares in the round, or amend the terms." Upon information and belief, existing Series A-2

2  shareholders were not consulted about this extension.

3      52.    Centripetal raised $2,000,000 in Series A-2 Preferred share sales early in Q1 of

4  2015—only one-third of its full-year cash requirements. The largest purchaser, with an investment

5  of $1,000,000, was the NYCA Investment Partnership LP ("NYCA"). Other investments consisted

6  of $750,000 from James Ginsburg ("Ginsburg") and $250,000 from Steven Helms ("Helms").

7  Centripetal Board Member Cristobal Conde is listed as an LP advisor on the NYCA website.

8  **Centripetal Sweetens the A-2 Terms by Adding Warrants, but Fails to Follow Through**

9      53.    The $2.0 million in fundraising in Q1 of 2015 was only slightly more than the $1.5m

10  quarterly cash burn, leaving Centripetal in urgent need of additional capital. Thus, in Q2 of 2015

11  Centripetal sweetened the Series A-2 Preferred Share issue by adding warrants, a financial

12  instrument that allows investors the option of purchasing additional shares at a set price in the

13  future. In conjunction with the addition of the warrants, the Series A-2 offering was extended until

14  December 31, 2015.

15      54.    Because warrants were offered to **new** Series A-2 shares, **past** Series A-2 investors

16  (including Richards) needed to be granted an equivalent number of warrants relative to their

17  investment. Clause 1.3 of the Stock Purchase Agreement explicitly stated:

18      **1.3 Closings; Delivery**

19
20      … All such sales made at any Additional Closings (i) will be made on the same terms and conditions set forth in this Agreement.

21      55.    These new terms were communicated to shareholders in a letter dated May 20, 2015,

22  which was emailed to Richards by S. Rogers on May 21, 2015:

23      … the Board considered several financing alternatives and determined
24  that it is in the best interests of the Company and the Company's
    Stockholders to seek interim equity financing by expanding the Series
25  A-2 (the "***Interim Financing***"). The Interim Financing allows for the
    sale of up to $6,000,000 In additional shares of the Company's Series
26  A-2 Preferred Stock (the "***Series A-2  Preferred***") Through December
    31, 2015 with an additional warrant incentive <u>for all current and new</u>
27  <u>purchasers of Series A-2 stock.</u>  (underlining added).

28

LEWIS + LLEWELLYN LLP

56.     This letter included a document titled "ANNEX A – SUMMARY OF AMENDED TERMS SERIES A-2 PREFERRED STOCK FINANCING OF CENTRIPETAL NETWORKS, INC.", which included the terms outlined in the board letter.  This letter included a disclaimer stating:

> THIS SHEET SUMMARIZES THE PRINCIPAL TERMS OF THE FINANCING OF CENTRIPETAL NETWORKS, INC., A DELAWARE CORPORATION.  THIS IS A SUMMARY ONLY, THERE IS NO OBLIGATION ON THE PART OF ANY PARTY UNTIL A DEFINITIVE STOCK PURCHASE AGREEMENT IS SIGNED BY ALL PARTIES, AND THIS DOES NOT CONSTITUTE EITHER AN OFFER TO SELL OR AN OFFER TO PURCHASE SECURITIES.

57.     The letter also included an "Indication of Interest" form in which investors were asked to indicate how much they would be willing to invest in additional Series A-2 Preferred shares.  As Richards did not desire to commit more cash to the company, he did not return the form.  Notably absent from this form was anywhere for a shareholder to indicate that they were only interested in receiving the promised additional warrants.

58.     Having not heard anything from Centripetal regarding this proposed Interim Financing, and having never received the new Stock Purchase Agreement reflecting the promised ownership in additional warrants, Richards assumed that Centripetal had not proceeded with this sweetened offer.  However, Richards's detailed review of Centripetal's finances in 2022 exposed some questionable transactions.

59.     This sweetened offer itself apparently met with a tepid response, garnering only one additional investment, a further $250,000 investment from Helms.  Oddly, Centripetal's later financials indicate that Helms did ***not*** receive any warrants in conjunction with his investment.

60.     In contrast, NYCA ***did*** receive 200,000 warrants for the future purchase of Centripetal shares, constituting a ratio of 0.2 warrants for each dollar of Series A-2 investment. On information and belief, those warrants accompanied the Series A-2 purchase.  Thus, when Centripetal offered the sweetened terms to other Series A-2 investors, it is highly likely that NYCA had ***already*** been granted their 200,000 warrants as part of their Series A-2 investment, in violation

LEWIS +
LLEWELLYN
LLP

of Clause 1.3 in the Stock Purchase Agreement.

61.     While the enhanced Series A-2 offer generated very little interest, Centripetal did manage to find its needed funding in the form of an additional $3,000,000 sale of Series Notes.  As a result, and despite having already included warrants in NYCA's purchase, Centripetal reneged on the offer to Series A-2 buyers to have warrants added to their purchase—even though the old Stock Purchase Agreement required all sales to be on equal terms.  As a result of this fraudulent behavior, Centripetal had a strong incentive to hide the warrant issue in its financial statements (as it subsequently did).

**Centripetal's Improper 2015 Warrant Accounting**

62.     In spite of issuing 200,000 warrants to NYCA, Centripetal made no mention of that warrant issue in its 2015 financial statements.  The Statement of Stockholders Equity did not have a line for warrants, as it only included the 2,571,723 shares of Series A-2 that were issued in 2015. There was no mention of warrants on the Balance Sheet or the "Financing News" section of the commentary, and the Statement of Cash Flows specifically stated "-", indicating zero, next to the line headed "Stock Warrants".[9]

63.     That said, a very close analysis of the statements reveals Centripetal struggling with how to account of the warrants in its financial reporting while at the same time hiding the issue.  For example, in the 2015 Q1 financial report the shows Additional Paid In Capital (APIC) of $1,999,771 for the Series A-2 issue, this being the issue price of $2,000,000 minus the par value of $229. Meanwhile, the Statement of Cash Flows lists the increase in APIC from "Financing Activities" as $2,069,437.  As the only "Financing Activities" that occurred during the quarter were the Series A-2 share issue and the (undisclosed) warrant issue, the implication is that Centripetal estimated the additional paid-in capital from the warrant issue at $69,666 ($0.348 per warrant, a seemingly reasonable figure), and that they then added this figure to the "APIC from Financing Activities"

---

[9] Under GAAP, when warrants are included as part of an offering of other securities, separate values are to be calculated for both the warrants and the other securities, with these values being recorded in the appropriate places in the financial statements.

LEWIS +
LLEWELLYN LLP

line.[10]

64.    This is a mistake.  The appropriate accounting treatment for a "stock plus warrants" transaction is to estimate the APIC for the warrant portion of the issue (which they apparently did, coming up with $69,666), but to then subtract this value from the purchase price for the shares, thereby lowering the effective price paid for the shares (which creates the "unfairness" between the NYCA deal and the other Series A-2 issuances) as well as lowering the APIC created by the share purchase.

65.    The second report that included the period of the warrant issue was labeled "Investor Report for Q3 2015", although the financials therein are only through August and not for the entire first 9 months of 2015.  There was no mention of warrants being issued (again including a "-", indicating zero, on the line for "Stock Warrants"), but the APIC mistake in the Cash Flow Statement was corrected, although the warrant value was not split out from the Series A-2 value.   A similar treatment appears in the 2015 annual report.

66.    In spite of the warrants issued to NYCA, the other Series A-2 investors did not receive the warrants promised to them in the May 20, 2015 letter.  Thus, Centripetal was in violation of both its written promises and the Series A-2 Stock Purchase Agreement.

67.    Centripetal therefore failed to deliver 100,000 warrants with a strike price of $0.60 to Richards.  Had Centripetal followed through on its promises, Richards's warrants would have been worth a minimum $158,700, in early 2022, utilizing the artificially-low buyout price of $2.18 per share in Centripetal's fraudulent squeeze-out merger.

**In May of 2015, Centripetal Restructures its Board**

68.    Also included in the May 20, 2015 letter to stockholders was news that the company's Board of Directors was being restructured.  The new Board, "as of May 2015" was Joseph Addiego ("as the director elected by the holders of Series A Preferred Stock"), William Crowell ("as the director elected by the holders of Common Stock"), Steven Rogers ("as the CEO director") and Sophia Corona ("Corona") and Cristobal Conde ("as directors elected by the holders

---

[10] This also serves to pinpoint the timing of the warrant issue to Q1 of 2015, the same quarter when NYCA purchased its Series A-2 shares.

LEWIS +
LLEWELLYN LLP

of all capital stock").

69.     The above changes effectively meant that Addiego replaced Louie on the Board. Crowell, Rogers, and Conde remained, as did Corona (who apparently joined the board sometime in 2014).  Winter, Flores and Gourley departed.  Goone also appears to have relinquished his role as an advisor around this same time.

70.     On information and belief, one of the reasons for this change was the Board questioning S. Rogers abilities as CEO (a role the Board could not remove him from) and J. Rogers abilities as CFO (also in the letter was an announcement that J. Rogers would be transitioning to be the VP of Operations).  Paul Barkworth, then the Controller and VP Admin, was moved into the CFO role shortly thereafter.

**Centripetal Signs Term Sheet for a $20 million B-Round with Option3, A-2 Round Closed**

71.     In July of 2015, Centripetal signed a term sheet for a $20 million B-Round investment from Option3.

72.     With this term sheet in hand, Centripetal elected to close the Series A-2 Preferred Share offering.  Jonathan Rogers stated on July 16, 2015: "The A-2 closed with a total amount raised that was just over $8mm. ($8,036,413)".  That amount appears on the SEC Form D that was filed belatedly on June 30, 2016.

**In August 2015, Hudson Bay Invests $3,000,000 in the Series Notes**

73.     While a term sheet had been signed for a B Round, closing was still some time away, and Centripetal was in urgent need of operating funds.

74.     In August 2015, a new investor, Hudson Bay Master Fund Ltd ("Hudson Bay"), invested $3,000,000 in the Series Notes, bringing the total amount of Series Notes outstanding to $6,000,000.[11]  Hudson Bay also negotiated a side letter that allowed it to elect for a ***cash payout*** in the event of any Note Maturity or a Qualified Financial Transactio n ("QFT").  Centripetal did not disclose this cash payout option to other investors, either explicitly or in its financial statements..

---

[11] Technically, the Series Notes only had $35,000 of availability left under their $6,000,000 issuance cap, but Centripetal apparently decided this was a "currently outstanding" cap and not a "total issuance" cap – even though the latter is reflected in the wording of the Note Purchasing Agreement.

LEWIS +
LLEWELLYN LLP

75.     Centripetal's "Investor Report for Q3 2015" lists Hudson Bay's $3,000,000 Series Note as "Equity", but the cash redemption option Centripetal gave Hudson Bay meant that note was effectively debt (under GAAP) because Hudson Bay could demand cash repayment, potentially causing considerable financial stress for Centripetal (something that did, in fact, happen).  By listing the Hudson Bay investment as "Equity," Centripetal misrepresented the nature of the note and its terms.

76.     Hudson Bay's note also had a Maturity Date of June 1, 2016—meaning it should have been shown as a "Current Liability" in Centripetal's financial statements.

**Option3's B-round is Delayed, Richards and Option3 Provide Interim Financing**

77.     Despite raising $5,250,000 in the first nine months or so of 2015 ($2.25m in Series A-2 Preferred Shares and $3.0m in Series Notes from Hudson Bay), cash was again getting tight. Centripetal reported "Cash Used by Operating Activities" of $5,947,109 for 2015 (excluding an additional $710,000 "Investment in Intangible Property").

78.     Meanwhile, Option3's planned B-round was delayed.  As a result, Centripetal again sought bridge financing, issuing two convertible notes to Option3 for $1,000,000 each in November and December 2015.

79.     Richards also participated in this bridge financing, purchasing a $250,000 convertible Note on December 23, 2015.  Upon information and belief, Richards's Note had similar terms to the Option3 notes.  Because of Centripetal's deception with respect to Hudson Bay's investment in the Q3 2015 Investor Report, Richards was unaware of the true state of Centripetal's finances at this time.

80.     Centripetal again mischaracterized the Hudson Bay investment as "Equity" in its "Annual Investor Report" sent on February 23, 2016.

81.     Option3 provided additional bridge financing in early 2016, purchasing two $250,000 convertible notes, one on February 23, 2016 and the other on March 28, 2016.

82.     Richards also added to his investments, purchasing a second $250,000 convertible Note on April 12, 2016.  Because of Centripetal's ongoing accounting deception, he was still unaware of the true nature of the Hudson Bay Note at the time of his purchase.

LEWIS +
LLEWELLYN LLP

1

**In 2016, Clashes with Hudson Bay Leave Centripetal on the Verge of Bankruptcy**

2     83.     On April 20, 2016, Centripetal announced that the $20 million B Round investment

3    from Option3 intended to close on August 28, 2016.  Steven Rogers had informed Richards of this

4    potential investment in July of 2015, and it was also the "Next O3 Round" anticipated in Clause 3 of

5    Richards's Notes.

6     84.     In connection with that transaction, Centripetal CFO Paul Barkworth sent Richards

7    an email (also on April 20) attaching the "Series B Preferred Stock Purchase Agreement" and

8    signature pages to effect Richards's conversion of his Notes into Series B preferred shares.  The

9    Stock Purchase Agreement that Barkworth attached included a capitalization table showing 518,829

10   warrants outstanding, divided into two types: "Loan Warrants" owned by William Thomas and

11   "Warrants" owned by both "Fintech Lab" and "NYCA Investment".  At this point in time, Richards

12   did not realize that NYCA's warrants were associated with its Series A-2 Preferred share

13   investment.

14    85.     Also on April 20, 2016, Hudson Bay informed Centripetal that it would exercise the

15   cash redemption option on its $3,000,000 Series Note.  That redemption option stemmed from the

16   aforementioned side letter, of which Richards was unaware and which Centripetal effectively hid in

17   its financial statements.  Centripetal did *not* inform Richards of Hudson Bay's cash redemption

18   demand or the side letter permitting Hudson Bay to make its demand.

19    86.     Hudson Bay's cash demand created a funding deficit and additional uncertainties for

20   Centripetal, which caused some of Option3's anticipated investors to pull out of the deal.  While

21   efforts continued for several months to salvage the transaction, ultimately the "Next O3 Round"

22   never happened.

23    87.     Hudson Bay's demand also appears to have caught Centripetal by surprise—

24   Centripetal accused Hudson Bay of intentionally sabotaging the B Round deal, Centripetal did not

25   pay on the Maturity Date of Hudson Bay's note, and litigation followed.

26    88.     Unaware of Hudson Bay's redemption demand, on April 25, 2016, Richards asked

27   Barkworth to convert his two Notes, *i.e.*, exercising a right that would have been triggered by the

28   closing of the "Next O3 Round."  Barkworth replied that he was "pleased to hear that you plan to

LEWIS +
LLEWELLYN
LLP

convert, so I'd appreciate it if you will send me the signed documents, which will be held in escrow pending the closure of the round."

89.     By asking Richards to commit to the deal without disclosing Hudson Bay's redemption demand or the side letter, Barkworth intentionally and materially misrepresented Centripetal's financial position.

90.     Richards did not learn of Hudson Bay's lawsuit against Centripetal until November 17, 2016—five months after it was filed.  Instead, Richards was only told that the B Round was delayed.  Meanwhile, on June 24, 2016, Barkworth emailed Richards that "the lead investor [in the B Round, Option3] is enthusiastic, our documentation is complete and we're aiming to close [the B Round] in July."  Barkworth again said nothing about the pending Hudson Bay litigation, nor about the upcoming requirement for Centripetal to repay Hudson Bay's $3,000,000 investment.

**The Series Notes Mature After Being Extended to June 17, 2016; Hudson Bay Sues**

91.     In May of 2016 Centripetal extended the maturity of the Series Notes, including Hudson Bay's $3,000,000 investment in the Series Notes, from June 1, 2016 to June 17, 2016.

92.     This extension was invalid, as it required a majority vote of the noteholders, as reflected in Clause 6.6 of the Note Purchase Agreement (dated October 31, 2014):

> **6.6 Modification; Waiver.** No modification or waiver of any provision of this Agreement or consent to departure therefrom shall be effective unless in writing and approved by the Company and the holders of Notes representing *a majority of the outstanding unpaid principal amount of the Notes* (the "Majority Holders"). Any provision of the Notes may be amended or waived by the written consent of the Company and the Majority Holders; provided, however, that such amendment affects all holders of Notes in the same fashion; and provided, further, that any change to the principal amount or interest rate of any Note shall require the separate consent of the holder of such Note. (emphasis added).

93.     On June 17, 2016, the $3,000,000 Hudson Bay investment in the Series Notes reached maturity, at which time Centripetal was obligated to redeem the notes in cash as per Hudson Bay's demand under its side letter.  This payment was not made, as Centripetal did not have the cash to do so.  Thus, on that same date, Hudson Bay sued Centripetal in the United States District Court

LEWIS +
LLEWELLYN
LLP

1    for the Eastern District of Virginia.

2        94.    Also on June 17, 2016, the $3,000,000 in Series Notes ***not*** owned by Hudson Bay,

3 and mostly held by insiders, reached their newly-modified Maturity Date (for clarity, this did not

4 include Richards's Notes). At maturity, and in the absence of a B-round of financing, those notes

5 were due to automatically convert into equity per Clause 3 of the notes:

6             **Clause 3:** If the Company has not consummated a Qualified Financing
7             by the Maturity Date, ***the outstanding principal balance of this Note***
            ***shall automatically convert*** in whole without any further action by
8             Holder into shares of a new series of the Company's preferred stock at
            a per share conversion price equal to the average of (i) $0.2494, and (ii)
9             the fair market value as of the Maturity Date of a share of the most
            senior preferred stock of the Company determined by a reputable
10             valuation firm mutually acceptable to the Company and the Majority
            Holders.
11

12 (Emphasis added.)

13        95.    On July 12, 2016, Richards emailed Barkworth and S. Rogers noting a discrepancy in

14 the note extension he had just signed, saying:

15             … with respect to the note extension – I didn't hear back from you
            and (to be bluntly honest) I forgot all about it. But then when I looked
16             at my two notes it would seem that my "Maturity Dates" aren't until
            Dec 23, 2016, so I don't think the extension applies to me anyway. Is
17             this correct, and is that why you haven't pursued me in spite of my
            forgetfulness?
18

19 Richards did not receive a reply to this email.

20        96.    While the non-Hudson-Bay Series Notes should have automatically converted on

21 June 17, 2016 (or June 1, 2016 if the brief extension was deemed invalid), nothing appears to have

22 happened until July 15, 2016 when these notes were again amended. Richards was not notified of

23 this amendment, possibly due to his email days earlier highlighting that his notes were different than

24 the Series Notes.

25        97.    Instead of being converted, and on information and belief, the Maturity Date for the

26 Series Notes was extended to November 27, 2016 in this July 15, 2016 amendment. Richards was

27 not asked to participate in this much longer time extension (indeed he didn't discover it until much

28 later).

LEWIS +
LLEWELLYN
LLP

98.      Further, and on information and belief, the extension was an "insider deal" spearheaded by Alsop Louie (who had two members on the Board, these being William Crowell and James Addiego) and other interested Board Members.  At this point in time, half of the Series Notes not owned by Hudson-Bay (who had elected for redemption based on a side letter) were owned by Alsop Louie, with other Centripetal Board Members owning an additional 25% of the issue (the largest Board investor being Cristobel Conde with a $500,000 investment).

99.      These "mostly insider" investors were motivated by Hudson Bay's actions to extend the Series Notes because, if the notes did convert into equity according to their express terms and Centripetal went through bankruptcy or some other reorganization, then the now-former noteholders would lose their senior claims on company assets. [12]

100.      If some stakeholders benefitted from an extension (*i.e.,* the holders of the Series Notes, primarily insiders / Board Members), other stakeholders were disadvantaged.  Richards was a "loser" in this extension as the Series Notes were senior to his notes, whereas equity was not.  This meant that the extension deprived Richards of the opportunity to move up the seniority ladder in the event of a Centripetal bankruptcy, and it also meant that Richards's opportunities for repayment on the notes decreased, due to Centripetal still having a $3,000,000 senior liability on the balance sheet.  The lack of automatic conversion of the Series Notes further meant that Richards also missed out on an attractive note conversion opportunity, should the new shares have been issued at a very attractive price.

**Centripetal's Cash Flow Difficulties Continue in Late 2016**

101.      With the Hudson Bay lawsuit ongoing, and with the Option3 B-Round stalled, Centripetal again faced significant cash flow difficulties.  In a July 21, 2016 email, Richards asked "Did you get your anticipated interim funding?", to which Steven Rogers replied, "No, some is expected by Friday and more next week."

102.      That interim funding was coming from Option3, but it was slow to arrive and did not

---

[12] At some point the terms of the Series Notes were changed to allow for a cash repayment instead of automatic conversion—substantially benefitting Alsop Louie and other insiders who owned Series Notes at the expense of other shareholders (including Richards) and also at the expense of Richards in his position as a noteholder.  This also meant they were now debt, not equity.

1  meet Centripetal's ongoing operating expenses.  Between the end of April 2016 and the end of the

2  year, Option3 made an additional $2,245,000 in bridge loans, bringing its total to $3,745,000.

3         103.    On August 29, 2016, Steven Rogers continued to assure Richards that Centripetal

4  would close the B Round with Option3.

5         104.    In late 2016, Centripetal began to miss payroll, and the company also failed to pay

6  the appropriate withholding taxes to the U.S. government.

7         105.    **In September of 2016, the entire board of Centripetal, other than Steven Rogers,**

8  **resigned.**  Richards did not learn this had happened until after he became aware of the Hudson Bay

9  lawsuit on November 17, 2016.

10                     **The Series Notes, and Richards's Notes, Mature Again in Late 2016**

11        106.    On November 29, 2016, counsel for Centripetal sent Richards an agreement to sign

12  electronically.  This agreement was titled "November 2016 Omnibus Amendment to Convertible

13  Promissory Notes", and it was a maturity date extension for the Series Notes to March 31, 2017

14  from the previous maturity date of November 27, 2016 (this maturity apparently being set as part of

15  an amendment on July 14, 2016).  Part of the agreement read:

16                A. The Company has entered into (i) that certain Note Purchase

17                Agreement, dated July 12, 2013 (as amended, the "2013 Purchase
                  Agreement"), and (ii) that certain Note Purchase Agreement, dated

18                October 31, 2014 (as amended, the "2014 Purchase Agreement", and
                  together with the 2013 Purchase Agreement, each a "Purchase

19                Agreement"), pursuant to which the Company has issued convertible
                  promissory notes (as amended, including without limitation on July 15,

20                2016, each a "Note") to certain investors (each a "Note Holder") …

21

22        107.    Richards emailed back, pointing out some of the differences between his notes and

23  the Series Notes, and Burke replied

24                You can disregard the DocuSign.  **We (Cooley) hadn't seen your**

25                **note(s) until you sent the email below (Centripetal must have handled**
                  **them itself)**, so we didn't realize they had a different maturity date.  We

26                will coordinate with Centripetal to make sure we have the correct terms
                  and details for your notes.  Apologies for the confusion. (emphasis

27                added)

28

LEWIS +
LLEWELLYN
LLP

1    108.    Richards's Convertible Promissory Notes reached Maturity, entitling him to

2    automatic repayment, on December 23, 2016.

3    109.    Centripetal ignored the maturity date of the Notes.  Richards embarked on trying to

4    get them extended.  On February 9, 2017, Richards signed a Note Amendment extending the

5    Maturity Date on both of his Notes to December 31, 2017.

6    110.    Upon information and belief, Centripetal issued another convertible note worth

7    $250,000 to an unknown investor in 2016.

8
**In 2017, Centripetal Narrowly Avoids Bankruptcy, but Continues Deceiving Its Investors,
Including Richards**
9

10    111.    Steven Rogers sent out the 2016 Centripetal Investors' Report on February 14, 2017.

11    112.    That report did not mention the company being in arrears on payroll or payroll taxes,

12    or of the entire board resigning.  Nor did it mention Hudson Bay's election to redeem its $3,000,000

13    investment, or the associated litigation.  While the company did move Hudson Bay's investment

14    from Equity to Debt (*i.e.*, to where it always should have been), the company continued to report

15    $8,148,279 in convertible loan notes in Equity.  Given that these notes were all redeemed instead of

16    converted, it is likely that they all should have been reported as Debt.

17    113.    In March 2017, despite the rosy picture presented to investors, Steven Rogers raised

18    the possibility that Centripetal could declare bankruptcy.

19    114.    On March 18, 2017 Barkworth emailed an ex-employee who was suing the company

20    for back pay and unpaid taxes, stating (in part), "the company is working very hard to try to resolve

21    the unpaid taxes for last year."  This email also stated "the company also needs to settle the back pay

22    and this will be done in 2017".

23    115.    On March 27, 2017, Hudson Bay secured a judgment against Centripetal for

24    $3,244,110.24.  The judgment became final on April 19, 2017, and included hundreds of thousands

25    of dollars in attorney's fees.

26    116.    On April 12, 2017, Centripetal filed an amended and restated Certificate of

27    Incorporation increasing the number of authorized shares of common stock by 55.6% from 90

28    million to 140 million – yet Centripetal's financial reports ***continued to list "Common Stock***

LEWIS +
LLEWELLYN
LLP

*authorized" at 90,000,000 for several more years.*[13]  Centripetal did not notify Richards of this change.

117.    Beginning on April 17, 2017, Richards attempted to learn more about Centripetal's then-current efforts to raise capital.  Steven Rogers would only divulge that Alsop Louie would "approve [something] over the weekend."[14] Centripetal appears to have raised approximately $8.5 million over the course of 2017 (plus an additional $250,000 in early 2018).

118.    Centripetal never issued a Q1 2017 Investors' Report to Richards.

119.    On July 25, 2017, Centripetal issued its Q2 2017 Investors' Report.  That report contained inaccuracies, violated accounting conventions, and hid the nature of the 2017 financing.

120.    Also excluded from the Q2 2017 Investors' Report—and from every other financial report Centripetal sent to investors—was any mention of the tremendous expansion of the company's stock option plan.  On information and belief, most of this increase resulted from options Steven Rogers granted to himself (in his position as sole Board Member), so that he could personally continue to own more than 50% of the shares outstanding.[15]

121.    On September 29, 2017, Steven Rogers wrote: "We have selected a lead investor for our series B and are working to close by mid October".

122.    On October 6, 2017, Steven Rogers emailed Richards with a brief overview of the new potential B-round, stating that "proceeds will be approximately $30mm, in a combination of debt and equity."

---

[13] Centripetal continued to use the outdated 90 million figure in every financial statement until 2020, even though a second Certificate of Incorporation amendment in early 2018 increased the authorized shares to *200 million.*

[14] As the sole owner of the Series A Shares, Alsop Louie had approval rights over certain types of transactions, including a right of first refusal.

[15] Rogers had extra motivation to maintain the majority of outstanding shares, as the Amended and Restated Voting Agreement, dated June 2014, included the following clause: "The vote or written consent of the holders of at least a majority of the then-outstanding shares of Common Stock shall be required to remove Steven A. Rogers as President and Chief Executive Officer of the Company and to appoint his replacement."

In other words, as long as Steven Rogers held a majority of the company's shares, no Board could ever remove him from his position as President and CEO.

COMPLAINT
CASE NO.

LEWIS +
LLEWELLYN LLP

123.    On October 24, 2017, Rogers sent Richards a brief summary of terms for the proposed new B Round and a cap table.  That table showed the same 518,829 "Warrants" listed in the April 2015 cap table, with these warrants included in both "Total Outstanding Shares" and Centripetal's calculation of "Fully diluted" share ownership (accounting for 0.53% of the total).

124.    In addition to "Warrants" (all of which were reportedly issued prior to Richards's Note investments), the October 2017 cap table also included "Other Warrants" totaling 16,000,000. These "Other Warrants" appear to have been reserved for eventual inclusion in this potential B-round (*i.e.*, they were not yet issued), as the B-round included "(p)enny warrants equal to 1.0% of the fully diluted shares at initial close".

125.    Upon information and belief, this new B round was never consummated, at least not in the form represented in the documents Steven Rogers sent Richards (as supported by the fact that the $30 million figure quoted by Steven Rogers never appeared as new capital in Centripetal's books).

126.    While the October 2017 cap table doesn't show any newly *issued* warrants, this fact is inconsistent with the large increase in authorized shares that Centripetal approved in April 2017 – implying that there were other issued warrants not disclosed in the table (or to investors generally).

127.    In July of 2017, Centripetal sued Keysight Technologies Inc. ("Keysight") for patent infringement.  The cost of this lawsuit increased Centripetal's ongoing cash needs.

128.    On December 31, 2017, Richards's Notes again reached maturity.  Centripetal again did nothing.  When Richards inquired about funding in January 2018, Steven Rogers responded: "On the notes, everybody got tired of doing extensions so we didn't do one."

**In 2018, Centripetal Continues to Conceal Sales and Issuance of Equity Securities, While Authorizing the Issuance of Tens of Millions of Additional Shares**

129.    The Centripetal "Investor Report – 2017 Year End" (issued April 9, 2018) contains only one paragraph for "Financing."  It makes no mention of the previous year's fundraising, and no discussion of the 2017 capital increase.

130.    On January 22, 2018, Steven Rogers told Richards that he had "nothing new to report on financing".  Yet on February 15, 2018, Centripetal filed another amended and Restated

26

COMPLAINT
CASE NO.

LEWIS +
LLEWELLYN
LLP

Certificate of Incorporation, increasing the number of authorized shares of common stock another 42.9%, from 140 million to **200 million**.  Centripetal did not inform Richards of this increase, and it excluded reporting these from its Balance Sheet for several years thereafter.

131.     The 2018 Management Financial Statements show Centripetal raising $10.5 million in new capital in 2018.  The Statement of Cash Flows clearly identifies this new capital as "Secured Notes Payable", which the Balance Sheet shows under "Current Liabilities"—*i.e.*, not convertible and not in "Equity."  These were apparently short-term notes with detachable warrants, based on Centripetal's 60 million increase in authorized shares on February 15, 2018, along with its disclosure to Richards – albeit not until October of 2020 – that there were **77 million** warrants outstanding.  Nonetheless, Centripetal did not notify Richards that any new warrants were issued, nor did Centripetal inform him of any sale and issuance of equity securities in 2018.

132.     On February 13, 2018, Centripetal filed a lawsuit against Cisco Systems, Inc.

133.     On April 9, 2018, S. Rogers emailed Centripetal's "Investor Report – 2017 Year End" to Richards.  The "Financing" discussion section of this report included the commentary "The company is currently in the process of raising $40-$50mm in new capital. In order to support our expanded activities, our capital target has been increased. … We have strong demand for the round and are currently in negotiations. We expect that a formal closing will occur in Q2 2018."

134.     Just like the mid-year report, there is nothing in the 2017 full year financial statements to suggest any warrants were issued at all, and there was again no mention of the April 12, 2017 Amendment to the COI that increased the authorized shares from 90,000,000 to 140,000,000.

135.     On May 28, 2018, Richards emailed Steven Rogers to inquire about the financing Steven Rogers had advertised as "very close" earlier in the month.  Steven Rogers responded: "We signed Friday before last.  TS calls for closing in 30 days."

136.     On June 23, 2018, Steven Rogers amended his estimate to "1st week of July at this point[,]" and by September 28. 2018, he told Richards that the financing agreement had fallen apart—although it is unclear if this was actually a true statement.

137.     On October 9, 2018, Centripetal reached a settlement in its patent litigation with

LEWIS + LLEWELLYN LLP

1  Keysight.  The terms of that settlement are confidential, but in an April 2019 Shareholder Report

2  Centripetal divulged a "payment for past damages" from Keysight to Centripetal.

3        138.    In Centripetal's Shareholder Report for 2018, it reported total revenue of

4  $26,149,310.  This provided the company with enough cash to pay off the notes from both the 2017

5  Note & Warrant financing ($8.5 million) and the 2018 financing ($10.25 million).

6        139.    Still, Centripetal's 2018 financial statements include nothing to suggest that any

7  warrants were ever issued.  Centripetal also continued to report 90 million "Authorized Shares",

8  even though this figure had been increased to 140 million on April 12, 2017 and then again to 200

9  million on February 18, 2018.

10        140.    In mid-December 2018, after lengthy discussions and nearly a year after his Notes

11  had reached their extended Maturity Date of December 31, 2017, Richards and Centripetal signed

12  another note extension, to June 30, 2019.

13  **Centripetal's 2019 Accounts Continue the Deception**

14        141.    On May 10, 2019, S. Rogers sent Richards Centripetal's financial statements for

15  2018.  In the commentary section of this report, Centripetal highlighted that their patent

16  infringement lawsuit against Keysight had been settled, resulting in a meaningful payment to

17  Centripetal—recognized as $26,149,310 of "Total Income" in the first line of the Statement of

18  Operations.  A large drop in accrued expenses suggests Centripetal was finally able to settle the

19  outstanding back pay and payroll tax bills.

20        142.    The "Financing" section of this report made no mention of warrants being issued,

21  instead referring to the company's funding in 2017 and 2018 as "debt".

22        143.    The Statement of Cash Flows continued with this presentation, listing the financing

23  under "Secured Notes payable" under "Cash Flows from Financing Activities", along with the now-

24  customary "-", indicating zero, in the line next to "Stock Warrants".  Meanwhile, the 2018 balance

25  sheet also continued to falsely report that only 90,000,000 common shares were authorized.

26  **In 2019, Most Series Notes are Redeemed and Richards's Notes Mature, but Centripetal Refuses Payment**

27

28        144.    In the first half of 2019, most of the remaining Series Notes were redeemed for cash,

28
COMPLAINT<br/>CASE NO.

illustrating that Centripetal's previous characterizations of them as "Equity" were misleading.

145.    When Richards asked Steven Rogers about financing in the first six months of 2019, Rogers alluded to term sheets signed and potential new rounds, but did not provide details.

146.    On June 30, 2019, the Richards Notes again matured.  Centripetal ignored Clause 7 of the Notes, requiring it to immediately wire transfer to Richards the outstanding principal and interest.

147.    Richards was surprised to find Centripetal unwilling to pay the principal and interest on his Notes in 2019—the Notes were past due, every applicable contract required that they be paid, and Centripetal (at last) had the money to pay them.

148.    It was only later—specifically, after November 2020, when Richards began to discover Centripetal's years of omissions and malfeasance—that one possible reason for the delay emerged: as alleged in the Northern District of California action, Centripetal knew it had sold and issued thousands of equity securities since 2016 without giving Richards proper notice or honoring his right to convert.  As also alleged in the California action, in mid-2019, and while Richards was still unaware of the triggering events, Centripetal and the individual defendants sought to induce Richards into signing a bogus settlement agreement forfeiting his right to enforce the Notes, before he received his repayment.

149.    On August 1, 2019, Millennium Trust, the custodian for Richards's Notes, sent Centripetal a Notice of Default, stating "Payment for the Note, including all interest and principal, is due immediately".  Centripetal ignored the notice.

150.    On August 11, 2019, Richards emailed S. Rogers, after learning in a call the previous week that certain Series Note holders had been redeemed.  Richards asked for clarification as to why some noteholders ("holders, I believe of the same notes that I have") were paid off.  Rogers replied that Richards was in a different series of notes.

151.    Upon information and belief, most holders of the Series Notes redeemed – with the redemptions being (in terms of principal) $1,500,000 owed to Alsop Louie, $500,000 to the NYCIF, and $250,000 to former Board Member Sophia Corona (an additional $250,000 owed to Stanstel Services appears to have been paid off earlier).  That left Conde's $500,000 investment and an

LEWIS +
LLEWELLYN LLP

1    additional $250,000 investment (that may also have been from Conde).

2    152.    On August 16, 2019, Richards asked for "first half" (of 2019) financials.  Steven

3    Rogers delayed, insisting others needed to "check through them." On August 21, 2018, Steven

4    Rogers sent Richards a part-year financial statement for the period ending July 31, 2019.

5    153.    As discussed in greater detail in the Second Amended Complaint in *Richards I*, the

6    Centripetal Defendants fraudulently induced Richards to sign a purported settlement agreement in

7    2019, by falsely representing to Richards (both in discussions about the agreement, and in the

8    agreement itself) that there had been no triggering events for his conversion options, and that no

9    notices were due under his Notes.

10   154.    Had Centripetal been honest with Richards by i) not concealing the various issues of

11   equity securities and ii) giving Richards the notice due under his Notes, Richards could have

12   converted his Notes into shares at very attractive prices, or into warrants at even more attractive

13   prices.  *See Richards I.*  Had this happened, the shares or warrants acquired by converting the Notes

14   would have appreciated in value many times over.

15   155.    Indeed, Richards's rights to convert at the very attractive 2016-2018 conversion

16   prices **still existed in late 2019**, and the Notes specify that "No delay or failure on the part of the

17   Holder in the exercise of any right or remedy shall operate as a waiver thereof".

18   156.    Defendants (and particularly Steven Rogers, the majority owner) had a particularly

19   strong incentive to continue deceiving Richards and to induce him to either forfeit his rights or

20   convert at a much less attractive price.  ***Centripetal*** knew that the triggers had happened (even if

21   Richards had yet to realize it), and that these conversion options were – already in late 2019 –

22   extremely valuable.  Had Centripetal had informed Richards of these opportunities, and had

23   Richards had converted at the attendant low prices, the value of the stakes owned by Centripetal's

24   other investors (most notably Steven Rogers) would have been diluted.  Indeed, Steven Rogers may

25   have been in danger of losing majority control.

26   **Option3 Converts Most of Their Notes and Redeems the Rest, in Autumn 2019**

27   157.    Option3 began to engage Centripetal about the possibility of converting their notes

28   into equity – first mentioning it to Richards in an August 13, 2019 email from S. Rogers.

LEWIS +
LLEWELLYN
LLP

158.    On October 18, 2019, $150,000 of the $3,735,000 principal outstanding of Option3's notes were paid off.

159.    On November 29, 2019, and as part of a Note Conversion Agreement with Centripetal, Option3 converted the remaining $3,595,000 in principal value of the Option3 Notes into Series A-2 shares, resulting in Option3 owning 4,109,041 shares of Series A-2 Preferred Stock. With more than 4 million shares, Option3 became a "Major Investor", as defined in Centripetal's June 12, 2014 Amended and Restated Investors' Rights Agreement.

160.    Being a Major Investor conferred significant benefits upon Option3.  Major Investors are entitled to, amongst other information, i) annual financial statements within 120 days of year end, ii) quarterly financial statements within 45 days after each quarter, iii) a capitalization statement within 45 days of each quarter, iv) monthly unaudited income statements and balance sheets, within 30 days of month end, and v) budgets, business plans, and other similar information.  Major Investors also have a right to participate, at their option, in any "New Issuance", as that term is defined in the Investors' Rights Agreement. The existence of a Major Investor also created significant benefits for Richards, as it created additional oversight for a highly conflicted management team.

161.     Alsop Louie's Series A investment also entitled them to Major Investor status., and they were specifically exempted from the "Competitor" designation in the Investors' Rights Agreement in spite of being involved in similar businesses.[16]

162.    While it gained Major Investor status with its conversion, Option3 now alleges that Centripetal has, amongst other things, denied it the information due, and also denied it the opportunity to participate in future issuances of "New Securities".  Option3 has filed two actions against Centripetal in the Circuit Court for the County of Fairfax, Virginia.  The first, filed on July 23, 2021 (Case No. 2021-10652), seeks various financial and other data that Option3 alleged it was entitled to as the result of its status as both a shareholder and a Major Investor.  The second, filed on November 10, 2021 (Case No. 2021-15490), seeks "substantial damages" as a result of Centripetal's

---

[16] Alsop Louie was, for example, an investor in LookingGlass.  Gilman Louie served on the Board of LookingGlass.

LEWIS +
LLEWELLYN LLP

1  alleged failure to allow Option3 to participate in future issuances of various securities.  The two

2  suits have since been combined and are ongoing.

3       163.    Some of Option3's claims include allegations that Centripetal hid the issuance of

4  significant numbers of both shares and warrants, albeit in different circumstances, and at different

5  times, just as Centripetal did with Richards.  Option3 also alleges that Centripetal made false

6  warranties in the Note Conversion Agreement between the two parties, and that Option3 relied on

7  those false warranties in signing the agreement – hence they, too, are suing for fraudulent

8  inducement.

9       164.    On January 9, 2020, Richards asked S. Rogers if there were any funding updates, to

10  which S. Rogers replied "No funding news".  This said, Option3's allegations suggest that more

11  warrants may have been issued sometime in late 2019.

12       165.    On March 9, 2020, S. Rogers emailed Richards Centripetal's financial statements for

13  2019, which included net income of just over $8 million.

14      **In 2020, Richards First Discovers Some of Defendants' Illegal Acts and Omissions**

15       166.    Richards remained an investor in Centripetal due to his ownership of the Series A-2

16  preferred shares.  That meant he continued to receive investor disclosures, financial statements, and

17  other materials from Centripetal – and it also meant Centripetal and its officers still owed a fiduciary

18  duty to Richards.

19       167.    On October 7, 2020, Richards learned that Centripetal had obtained a $3.3 ***billion***

20  award from its lawsuit against Cisco.  (That judgment was later vacated on a finding of conflict of

21  interest, and returned for a new trial.)

22       168.    From October 7 through November 6, 2020, Richards asked Steven Rogers and

23  Jonathan Rogers about the potential impact of the damages award on the value of his existing

24  investment, and on the dilution of his A-2 preferred shares.  As part of those conversations, Richards

25  repeatedly requested a cap table.

26       169.    On November 6, 2020, Jonathan Rogers sent Richards a cap table dated October 31,

27  2020.

28       170.    That cap table raised numerous flags for Richards.

32

COMPLAINT
CASE NO.

LEWIS +
LLEWELLYN
LLP

a.    "Other Warrants" had ballooned to 76.7 million, a dramatic increase over the 16 million, apparently unused, warrants shown in October 2017.  Additionally, these Other Warrants were now included in "Total Outstanding Shares", implying they were now ***issued***, whereas previously they were not, instead being listed next to "Other Authorized Shares (Not Issued)".  The number in that category stood in stark contrast to the "stock warrants" lines that had shown "zero" in the Statements of Operations and Statements of Cash Flows that Centripetal had provided Richards in prior years.

b.    The number of options outstanding (on information and belief mostly options Steven Rogers had granted himself and the sole Board member of the company) had ballooned to 46,098,442, ***substantially more than the 41,725,371 common shares outstanding***.

c.    "Stock Warrants" also rose from October of 2017, although the increase was a more modest 250,000, to 768,829.

171.    Based on the above, and Jonathan Rogers's reluctance to disclose much about the warrants in their email exchange, in November 2020 Richards began to suspect for the first time that Defendants had concealed prior triggering events for his Notes, and omitted or obscured equity securities from prior financial documents and investor reports.

172.    Richards emailed Jonathan Rogers for clarification on what the "Other Warrants" were, and sent an email to himself (dated November 6, 2020), regarding the definition of "equity security," and whether it might apply to various types of warrants and option exercises.

173.    Realizing that Centripetal might have concealed warrants and/or option exercises to avoid notifying him of the opportunity to convert his Notes, Richards began to look back at the accounting treatment of those items in past financial statements and investor disclosures.

174.    This investigation gained a new impetus when, in February of 2022, Centripetal engaged in an unfair transaction that forced Richards to exchange his preferred shares for common shares.  Armed with new information, Richards embarked on a detailed study of Centripetal's past finances – an analysis which showed that Centripetal had systematically hidden almost all evidence of the sale and issuance of equity securities from its financial statements.  *See Richards I*, Second

Amended Complaint.  These issues included common stock, "convertible loan notes carrying the right to conversion into the company's Series A-2 preferred stock" and notes-with-warrants-attached and/or warrants themselves.

**In April 2021, an Option3-Commissioned Valuation Study Values Centripetal at $4 Billion**

175.    In April of 2021, Option3 commissioned a valuation of Centripetal by a "highly reputable valuation firm" according to an Option3 Complaint.  According to this Complaint, "Option3's valuation firm valued [Centripetal] at between $2 billion and $6 billion, taking into consideration current and expected patent infringement claims by [Centripetal] against several high-profile public companies", this resulting a mid-point valuation of $4 billion, after an assessment of the upside and downside scenarios.

**Centripetal Sues Gilman Louie, Alsop Louie, and LookingGlass**

176.    On September 14, 2021, Centripetal filed suit against Gilman Louie, various Alsop Louie entities, and LookingGlass Cyber Solutions alleging Patent Infringement, Breach of Contract, Breach of Fiduciary Duty and Abetting Breach of Fiduciary Duty.  In this Complaint, Centripetal lists five "Asserted Patents" that LookingGlass is allegedly infringing upon.  Unredacted allegations in this Complaint include:

> 36  LookingGlass has infringed and continues to infringe one or more claims of each of the Asserted Patents by engaging in acts that constitute infringement under 35 U.S.C. §271 …
>
> 43. In September of 2019, much to Centripetal's surprise, LookingGlass released its first product offering that utilized Centripetal's patented technology, despite being on notice of Centripetal and its patented technology.
>
> 44. In October of 2020, Mr. Louie became the CEO of LookingGlass. … (redacted)…
>
> 46. Centripetal is informed and believes that Alsop Louie aided and abetted in Mr. Louie's violations of his obligations to Centripetal.
>
> 47. LookingGlass has willfully infringed each of the Asserted Patents. Centripetal is informed and believes that LookingGlass had knowledge of the Asserted Patents through various channels and despite its knowledge of Centripetal's patent rights, engaged in egregious behavior warranting enhanced damages.

LEWIS +
LLEWELLYN

177. The first ten causes of action in this lawsuit allege patent infringement, either direct or indirect, on each of Centripetal's Asserted Patents.

178. The Eleventh Cause of Action is for "Mr. Louie's Breaches of Fiduciary Duties". Six paragraphs in this cause of action are either partially or fully redacted. Unredacted allegations include:

> 207. (redacted)… Mr. Louie's actions benefited himself (as LookingGlass was a portfolio company of Alsop Louie for which Mr. Louie was involved), and also benefited Alsop Louie (where Mr. Louie is a named partner), to the great detriment of Centripetal.
>
> 208. (redacted)… As a result of becoming a direct competitor of Centripetal using Centripetal's patented technology, Mr. Louie, as a managing member and named partner of Alsop Louie, stands to gain material financial or other benefit derived from LookingGlass
>
> 212. Centripetal did not discover Mr. Louie's breach of fiduciary duties until Centripetal learned that he became LookingGlass's Chief Executive Officer in October of 2020, which was shortly after LookingGlass's release of its first product making the unauthorized use of Centripetal's patented technology.
>
> 214. Centripetal has incurred and continues to incur damages and irreparable injury as a direct and proximate result of Mr. Louie's breach of his fiduciary duties.

179. The Twelfth Cause of Action is for "Mr. Louie's Breach of Confidentiality Obligations". One paragraph in this cause of action is fully redacted. Unredacted allegations include:

> Centripetal is informed and believes that Mr. Louie breached his confidentiality obligations in, *inter alia*, advising, guiding and directing LookingGlass' business, which has resulted in LookingGlass changing its business model and becoming a direct competitor of Centripetal, as well as an infringer of Centripetal's Patents.

180. The Thirteenth Cause of Action is for "Alsop Louie Capital and Alsop Louie Partners's Breach of Confidentiality Obligation", and is similar in its allegations to the Twelfth Cause of Action.

181. The Fourteenth Cause of Action was for "Alsop Louie's Aiding and Abetting of Gilman Louie's Breach of Fiduciary Duties".

LEWIS +
LLEWELLYN LLP

182.     The Prayer for Relief in this Complaint asked for, amongst other items, i) a preliminary and permanent injunction with regard to patent infringement, ii) an award of damages for said patent infringement, iii) treble damages, iv) costs and reasonable attorneys' fees, post judgement and prejudgment interest, v) damages, including attorney fees and costs relating to Mr. Louie's, Alsop Louie Capital's and Alsop Louie Partners' alleged misconduct.

183.     Option3 filed a second suit against Centripetal in the Circuit Court of Fairfax County, Virginia pn November 10, 2021.  *Option3 Cyber Investments, LLC v. Centripetal Networks, Inc.*, Case No. CL 2021-15490.

**In December 2021, Centripetal Dismisses Its Case Against LookingGlass, Alsop Louie *et. al.***

184.     On December 13, 2021, Centripetal suddenly dismissed its multi-pronged lawsuit against LookingGlass Cyber Solutions, Gilman Louie, Alsop Louie Management LLC, Alsop Louie Capital 2, L.P. and Alsop Louie Partners 2, LLC.

185.     The abrupt dismissal of the patent infringement claims after Centripetal achieved a multi-million-dollar settlement against Keysight and won a multi-***billion***-dollar award against Cisco (admittedly being re-tried) is particularly curious.  Further, the claims (also dismissed) against Gilman Louie and the various Alsop Louie entities also appeared quite serious – yet Centripetal was willing to abandon them even before any of the defendants had even filed an answer.

186.     Based on the events that followed, S. Rogers and J. Rogers appear to have coerced Alsop Louie into participating and supporting an upcoming sham transaction in which Alsop Louie exited its investment in Centripetal at a knock-down price, while also providing Centripetal cover to fraudulently force the other preferred shareholders to either accept the same, artificially-low price or lose their preferred shareholder status (a lose-lose situation for said preferred shareholders).

187.     The benefits to both Gilman Louie and Alsop Louie were clear – not only did they rid themselves of a potentially expensive and certainly embarrassing lawsuit, but they also appear to have rid a major portfolio company (one in which Gilman Louie was Chairman and CEO) of a potentially crippling patent infringement lawsuit.  Those benefits, of course, didn't accrue to the ***other*** preferred shareholders who were forced to participate in the upcoming transaction, including Richards.

LEWIS +
LLEWELLYN
LLP

**Centripetal Notifies Richards of the Proposed Squeeze-Out Merger**

188.   On January 23, 2022, J. Rogers emailed Richards a "Shareholder Notice Letter" that outlined an upcoming merger transaction involving Centripetal.  This letter, which was notably signed by "Centripetal Networks, Inc.", outlined a transaction in which each share of the Centripetal's Series A or Series A-2 Preferred Stock outstanding will be converted into the right to received, at the election of the holder, either:

(a) an immediate payment of $2.187 in cash, or

(b) a lesser immediate cash payment of $0.997 plus a proportionate participation right in certain future payments from the Company's litigation with Cisco Systems and certain other potential future payments generated by the Company's current intellectual property, up ot a maximum of $4.613 per share in the aggregate from such participation right, or,

(c) common stock in the new holding company which will then own 100% of the equity of the Company.

189.   In addition to the offer for preferred shares described above, "(e)ach share of the Company's common stock outstanding immediately prior to the merger will be converted into the right to receive common stock in such new holding company".

190.   According to this letter, "the Company has been in discussion with a number of preferred stock investors regarding the potential for a transaction in which they and other stockholders … could exit that investment for significant cash consideration".  Additionally, "(t)wo of the largest holders of the Company's preferred stock have agreed to support the merger transaction offering these alternatives".

191.   A merger transaction was not required to accomplish these goals.  Centripetal could just as easily offered a share buyback under the same terms.  With a "merger" however, Centripetal was able to force Preferred shareholders who didn't want to be bought out into exchanging their preferred shares for common shares.

192.   As of the date of this letter, the merger agreement had not been completed, as the letter stated "(w)e expect that in the coming days the merger agreement providing for the

LEWIS +
LLEWELLYN
LLP

consideration alternatives described above will be finalized, approved by the Company's Board of

Directors and approved through written consent by both the holders of a majority of our common

stock and preferred stock voting together as a single class and by the holders of a majority of our

preferred stock …"

193.     In terms of fairness:

> Prior to the Board voting on whether to approve the final merger
> agreement the Board expects to receive opinions from two different
> valuation firms (which have already expressed that view orally on a
> preliminary basis) to the effect that the consideration to be received
> in the merger is fair from a financial point of view to the stockholders of
> the Company unaffiliated with management.

194.     Richards replied to the email from Defendant J. Rogers and asked for access to the

Data Room, which he received.

195.     After an initial examination, Richards emailed J. Rogers again, with the following

questions / comments:

> I'm very confused about the "merger", as I don't see any documents
> regarding that in the data room (am I missing something)?
>
> Who is the acquirer, and is there a document that describes that
> transaction?
>
> What other information is available besides what is in the data room?
> I'm feeling very much in the dark at the moment.

196.     J. Rogers replied in an email on January 26, 2022 with a number of comments, the

most relevant to this Complaint being that "(t)The full merger agreement **will be provided** in

finalized and approved form, …" (emphasis added) and "(t)he certificate of incorporation and

bylaws of the holding company, **which will be added to the electronic data room**, will be a form

relatively common for private companies with a simple capital structure." (Emphasis added.)

197.     On January 27, 2022 Richards emailed J. Rogers with questions on employee option

exercises and the capitalization category of "Other Warrants".  J. Rogers replied:

/ /

/ /

/ /

LEWIS +
LLEWELLYN
LLP

> The warrants were issued to a third party professional investor who is not affiliated with the company. They were attached to a loan structure and came in several years ago as a financing source for the company under what was then an extremely difficult environment. The warrant agreement is remaining outstanding after the transaction.

198.    The wording "attached to a loan structure" indicates that these warrants were sold as "notes with attached warrants" not directly as "warrants".

199.    On January 28, 2022, Richards emailed J Rogers asking if "all of the information available to shareholders [was] included on the data site".  Rogers replied "I'm not sure what you're asking for,…" but offered to "speak about any questions your may have"  Richards replied with a rephrasing, asking "(h)ave you given any other preferred shareholders information that you haven't given me?".  Rogers replied:

> The shareholders have been given access to the same core materials. I believe we have given you more information than any other shareholder has requested or been provided in response to your specific questions. I will keep working on each of your other recent questions.

200.    In a separate email, also on January 28, 2022, Richards asked if he could get "copies of the original Certificate of Incorporation and all subsequent amendments".  J. Rogers replied that he had asked counsel to place the charter and amendment documents in the data room.

201.    In reply to another series of questions from Richards, also emailed on January 28, 2022, J. Rogers stated (in part) that (emphasis added):

> The COI for the new holding company **_will be provided_** in the data-room.  It will be filed as part of the final merger agreement.  It is a standard type of certificate for a private company with a single class of stock.

> The final merger agreement upon approval **_will be made available_** to the shareholders in the dataroom.

> The recent valuation from Houlihan Lokey has been provided in the dataroom. The fairness opinion has been concluded and will be entered shortly.

202.    In this same email Richards also asked: "(w)as there a reason this was structured as a merger and not just a stock buyback?".  J. Rogers replied: "Yes. There are a number of reasons that

LEWIS + LLEWELLYN LLP

this is structured as a merger. Considerations included rationalizing our capital structure and governance and providing liquidity options for our stockholders." These liquidity options could have easily been provided in a buyback transactions, whereas "rationalizing our capital structure and governance" were clearly designed to benefit S. Rogers as the majority owner of the common shares by fraudulently depriving the preferred shareholders of their preferred rights.

203.    Richards then asked J. Rogers, in an email on Sunday, January 30, 2022:

> Could I please see the "Draconian Damages Model" and the "Kramer Levin memorandum dated October 28, 2020" referred to on page 10 of exhibit 7.1.1?

204.    J. Rogers ignored this request.

205.    In a follow-up email on January 31, 2022, Richards expressed frustration with the process, including the following comments:

> OK, I've spent the weekend looking at the data room (although I must admit that this is a ridiculously short period of time to do this analysis), and I have a whole host of questions with more issues than answers at the moment.

> I do realize that completing an analysis anything like HL's is impossible given the time frame, I would like to be able to at least attempt some form of the most basic calculations before I'm forced to make a decision.

206.    Richards continued with more questions about the warrants, emailing J. Rogers again the same morning, asking (in part):

> OK, I know this is pedantic, but I can't even reconcile past accounts, let alone deal with some of the projections I'm seeing, and my frustration levels are running a little high.

> As I looked through the historical shareholder reports and compare them to what's in the data room, there is a difference in just how things were accounted for back in 2017. In one old report I see $8.5 million listed as "secured note payable" and in another it seems to be listed as "convertible debt".

> Am I right in thinking whatever this item was, it was connected to the warrants? In which case were there split maturity dates? Was the liability portion (whatever sort of liability it was) paid off, did it somehow convert, or is it still outstanding somewhere?

LEWIS +
LLEWELLYN
LLP

207.    Richards followed that with a set of ownership questions in a third email of the same date:

> Past documents have included the shareholdings of key employees, as well as a list of investors.
>
> Could you please tell me what the share and options positions are of the Board, as well as of any other meaningful key employees?
>
> Meanwhile, I've noticed that the identity of the warrant holder hasn't been disclosed, and information to that effect has also been redacted from the insurance contracts listed in the data room. How am I supposed to make an assessment of the future marketability of my shares (should I decide to remain an investor) if I don't know who a likely 35%-owner is?

208.    Richards then sent a fourth email to J. Rogers, (h), this time questioning a number of the assumptions in Houlihan Lokey's analysis.  In this email, Richards asked (with J. Rogers's responses in italics):

a.  about "Leverage Costs" of $42 million per year.  [*Ignored*.]

b.  what the "exceptional financing expenses" of $73 million in 2021 were, as well as whether they were insurance premiums. [*Ignored.*]

c.  the reason for the $350m debt projection in 2023.  *This is an expansion of the debt which I have previously told you is necessary to facilitate the transaction, the liquidity options, and the company's operational and legal requirements.*

d.  how the discount rate of 16-18% was justified in a scenario analysis, which Richards showed was "double counting" risk.   [Answered as "*you are incorrect*" with some additional commentary that Richards disputes.]

e.  what the "ongoing maintenance opex" was in the valuation analysis. [*Ignored.*]

f.  why a meaningful terminal value wasn't included in the valuation analysis, when J. Rogers had previously stated that the company goal was a "Qualcomm-like" business model. *The volatility produces a high degree of entanglement/correlation given the relationship of IP and core value.  An adverse event could mean that the terminal value is zero or less.*

41
COMPLAINT
CASE NO.

LEWIS +
LLEWELLYN
LLP

209.    In a fifth email dated January 31, Rogers asked:

> In looking at the 2021 financials, I see the statement that "The operational performance of the business necessitates and is alternative measured with certain GAAP exceptions, ***which are excluded here***." (emphasis added)

> Could I see the non-GAAP statements?

> Also, given that a meaningful portion of the Cisco payments are now insured, shouldn't at least the insured portion be capitalized and counted as a receivable on the balance sheet (for practical, if not for GAAP purposes). Have you done this in any of your non-GAAP statements?

> Have lenders and/or prospective lenders been shown financial statements and/or forecasts that are not in the data room?

210.    J. Rogers effectively ignored all of these last questions, providing only a comment from Barkworth as to why insurance policy proceeds wouldn't be included in GAAP statements (as opposed to non-GAAP statements, which is what was asked for).

211.    J. Rogers's replies, as well as his lack of answers. incensed Richards, who replied in an email on January 31, 2022 lambasting the Houlihan Lokey analysis.  J. Rogers replied, saying, in part "I do not believe your points are offered in good faith or that your criticism on the separate valuation analyses by intellectual property experts has any merit. … At this point we have provided adequate information in good faith for you to make your election decision."

212.    Richards replied to J. Rogers at 3:14 PM (q), apologizing for the tone of his comments, reiterating that he felt the time frame under which he was forced to do his analysis was unreasonable, and repeating his request for answers to his previous queries.  J. Rogers continued to ignore most of these questions.

213.    Richards grew even more concerned about the Houlihan Lokey analysis went he looked at the beginning disclaimer, which read, in part:

> This analysis, and any supplemental information or other documents provided in connection herewith, ***are provided solely for the benefit of*** McLane Middleton, PA, in its capacity as counsel to ***Messrs. Jonathan Rogers and Steve Rogers*** and may not be relied upon by any other person or entity.

LEWIS +
LLEWELLYN
LLP

1   214.   In other words, the Houlihan Lokey analysis was clearly ***not*** prepared for the benefit

2   of Centripetal shareholders.[17]

3   215.   The legitimacy of the Houlihan Lokey analysis was cast in further doubt by the fact

4   that each page was clearly labeled "*Preliminary Draft for Discussion Purposes Only*", suggesting

5   that Houlihan Lokey wished to distance itself from such a shoddy, manipulated, lowball valuation.

6   216.   With these concerns in mind, Richards included the following question in a sixth

7   January 31, 2022 email to J. Rogers:  "This brings up another question – are investors expected to

8   rely on HL's valuation in making their decision?".  Once again, J. Rogers refused to answer.

9   217.   As individuals, J. Rogers and S. Rogers had clear incentives to buy out the preferred

10   shareholders at as low of a price as possible, as well as to eliminate the preferred shareholder rights

11   of any owners of said shares who elected not to redeem.  Their actions, and the disclosures in the

12   Houlihan Lokey analysis, clearly indicate that this was the path that they were taking.  In doing so,

13   both of these individuals were in clear violation of their fiduciary duties to shareholders, made all

14   the more overt by the fact that they were the only two Board members of the company.

15   218.   Further, by not disclosing that they were ignoring their fiduciary duties and were

16   instead acting solely in their own self-interest, this in their capacity as shareholders and not Board

17   Members, S. Rogers and J. Rogers omitted material facts in conjunction with a securities

18   transaction.

19   219.   Richards emailed J. Rogers again on February 1, 2020 with questions about the

20   availability of documents in the Cisco litigation, with a postscript reminding J. Rogers that multiple

21   question sets remained outstanding, with Richards saying: "PS – as I'm sure you're aware, there are

22   still a few of my "question emails" outstanding. Apologies, but I'm trying to be a [*sic*] thorough as

23   possible while still working within the time constraints".

24   220.   Without adequate information regarding Centripetal's financial projections, and with

25   significant reservations as to the Houlihan Lokey analysis, Richards was nonetheless forced to make

26   his election in the tight timescale demanded by Centripetal.  Hence, on February 1, 2022 Richards

27

28

---

[17] Additionally, the legal firm mentioned, McLane Middleton, was not the firm that was representing Centripetal in this transaction.

LEWIS +
LLEWELLYN
LLP

emailed J. Rogers (cc'ing Barkworth, S. Rogers and Peter Smith of Kramer Levin), with his election

form selecting the common share option as opposed to any sort of buyout.  Richards again reminded

Centripetal that there were multiple questions about the deal outstanding, saying:

> Meanwhile, I am continuing to try to make sense of everything. In that vein, I believe there are still some "question emails" out there that I would appreciate a response on, even if you decide that your preferred reaction is "I'm not going to tell you", as then I would at least know I can stop chasing

221.    Richards finished his email with the following:

> Finally, with respect to the all-cash offer [of $2.05 per share], if there is anyone out there who has selected that, I would be interested in purchasing some additional shares outright at $2.50, subject to terms, if that's an available option.

222.    At this point in time Richards was not aware of Option3's analysis, completed less

than 12 months earlier and also prepared by "intellectual property experts" was $4 billion, **_over 10_**

**_times_** the valuation of $340 million calculated by Houlihan Lokey.

223.    Another measure of the absurdity of Houlihan Lokey's valuation was that the $340

million figure was a mere half of the $680 million that Centripetal was to receive in insurance

proceeds in the **_downside scenario_** that the Cisco litigation failed – even ignoring all of the other

patent claims the Centripetal had (both pending and potential) against other companies that were

infringing on their intellectual property.

224.    Having submitted his election form, Richards still looked through the data room for

additional information on Centripetal, and On February 1, 2022 he sent J. Rogers another email with

the subject of "Yet Another Due Diligence Question", writing (in part):

> So I noticed in the tax filing for 2020 that Steven's percentage shareholding is listed as 59.98%.
>
> I'm afraid I don't know that conventions for that type of reporting and I haven't been able to twist the cap table shown in the Capitalization section of the data room enough to get to that figure (this combined with past cap tables and employee ownership numbers that you've sent out).

//

> Could you tell me what the convention is, and hence what the numerator and denominator are in those calculations? Do they include no options, all options, just Steven's options, are warrants assumed to be exercised (or not), or is it something else entirely?

225.    Once again, J. Rogers ignored the question.

226.    On February 2, Richards emailed J. Rogers (as with the other emails, copying Barkworth, S. Rogers and Peter Smith of Kramer Levin) asking him to confirm receipt of the election form.  Included in this email was another request for Centripetal to answer the various questions Richards had posed.  Barkworth replied, confirming receipt, while the request for additional answers to Richards's questions was again ignored.

227.    On February 10, 2022, J. Rogers emailed Richards another letter regarding the merger transaction, this letter beginning with "This letter will provide an update and additional information regarding the Company's pending merger transaction.".  Once again, the letter was signed "Centripetal Networks, Inc.", again implying that it was being written on behalf of the Board of Directors in the exercise of their fiduciary duties to shareholders.

228.    The letter included an update of the supposedly independent valuations ascribed to the company, saying:

> In addition to the fair market valuation of the Company's equity from Houlihan Lokey previously included in the Company's electronic data room, the Board of Directors, as anticipated, has received in final form the opinion of a second independent valuation firm, Ocean Tomo, to the effect that the consideration to be received in the Merger is fair from a financial point of view to the holders of the Company's preferred stock. A copy of that fairness opinion is being added to the data room.

229.    Once again, no mention was made that the Houlihan Lokey valuation was made for S. Rogers and J. Rogers and not for Centripetal.

230.    Notably, Ocean Tomo, the provider of the so-called fairness opinion, was only engaged to "advise the Directors regarding the fairness *of the Purchase Price*", and to "deliver this letter to the Directors outlining our opinion as to whether the Purchase Price is fair, *from a financial point of view*." (emphasis added).  This conveniently *excluded* the fairness on the *non-financial portions* of the transaction, including the exchange of common shares for preferred shares that was

45

1   "forced upon" all preferred shareholders who elected not to accept the offer price.

2   231.   Further, the purported "fairness opinion" explicitly stated that essentially all

3   meaningful assumptions and projections were provided by Centripetal – *i.e.*, S. Rogers and J. Rogers

4   (in their conflicted roles).  This effectively reduced the "fairness" analysis to one of checking

5   Houlihan Lokey's math, as opposed to assessing whether the "inputs" provided for the analysis were

6   fair and/or reasonable.

7   232.   This letter also stated that:

8           The Board of Directors has now voted to approve the Merger
9           Agreement, a substantially final form of which will also be added to the
        data room.
10

11   233.   This "Board" consisted of two highly conflicted individuals, *i.e.*, S. Rogers and J.

12   Rogers.

13   234.   In another effort to get the preferred shareholders to accept their lowball buyout

14   price, the letter also highlighted a Bloomberg article which stated that "there has never in history

15   been a patent judgement in excess of $1 billion affirmed".

16   235.   According to the letter, Centripetal now expected the merger to become effective on

17   Monday, February 14, 2022.  Accordingly, the company extended the Election Form deadline to

18   Sunday February 13, 2022.

19   236.   On February 11, 2022, Richards received an automated email from the company

20   maintaining the data room stating that there were new documents available, including the fairness

21   opinion, the Bloomberg article and the merger agreement.  Richards emailed J. Rogers asking for an

22   emailed copy of the merger agreement as opposed to viewing it in the data room (which didn't allow

23   downloads or printing).  J. Rogers didn't reply.

24   237.   On February 14, 2022, Richards emailed J. Rogers (et al), noting that the four

25   Annexes to the Merger Agreement weren't in the data room, and repeating Richards's request for an

26   emailed copy of the agreement, saying:

27           In looking through the merger agreement over the weekend, and I
28           couldn't find the Annexes, in particular:

LEWIS +
LLEWELLYN
LLP

Annex A – Surviving Corporation Certificate of Incorporation
Annex B – Surviving Corporation Bylaws
Annex C – Form of Letter of Transmittal (which I believe you sent in this email)
Annex D – For of Deposit Account Control Agreement

I also presume you saw my previous request for an emailed copy of the Merger Agreement. If it's possible to get these by email, too, I would appreciate it. I'm afraid I'm Old School, and I still find reading from paper much easier than reading from the screen.

238.   J. Rogers did not reply.

239.   The February 14, 2022 email (as well as a follow-up email) also included questions on how to handle a supposed "Letter of Transmittal" associated with the merger.

240.   Richards then called J. Rogers asking about the Letter of Transmittal, which he memorialized in a February 24, 2022 email in which J. Rogers said nothing was required.  Richards then left voicemails for both Smith and Barkworth, which he again followed up with a memorializing email, again asking for clarification on the Letter of Transmittal.  Finally, on February 25, 2022 J. Rogers replied saying Richards *did* need to fill out the Letter of Transmittal, omitting the asked-for certificate information as Richards had never been issued certificates with his Series A-2 purchases.

241.   Richards filled out the form as requested and emailed it to Centripetal on February 28, 2022.  Richards than asked for confirmation that the form had been received, and on March 3, 2022 J. Rogers replied, saying:

No problems that I can see with your LoT. We'll record the shares for the Kawishi partners revocable trust for now and followup regarding certificates and publishing one for you for the full holding. When we're ready to send that we'll reconfirm your address for a fedex.

242.   On March 4, 2022, counsel for Centripetal emailed Richards a "Centripetal Notice" letter stating that the Merger became effective on February 22, 2022.  The first paragraph of this letter reads:

Pursuant to Sections 228 and 262(d)(2) of the General Corporation Law of the State of Delaware (the "DGCL"), you are hereby notified that the merger (the "Merger") of CNI Merger Sub, Inc., a Delaware corporation ("Merger Sub"), with and into Centripetal Networks, Inc.,

47

LEWIS +
LLEWELLYN
LLP

a Delaware corporation (the "<u>Company</u>"), pursuant to the Agreement and Plan of Merger (the "<u>Merger Agreement</u>"), dated as of February 22, 2022, by and among CNI Holdings, Inc., a Delaware corporation ("<u>Parent</u>"), Merger Sub, and the Company, was approved and such Merger Agreement adopted by written consent of the holders of a majority of the outstanding stock of the Company entitled to vote thereon as of February 22, 2022, and such Merger became effective on February 22, 2022.

243.    This letter also stated that any stockholder who did not vote in favor of the Merger or consent thereto in writing had appraisal rights. It gave instructions on how to claim those rights and supplied a form for accessing the data room.

244.    On March 22, 2022, Richards sent an email to Smith with the form attached, saying:

Please see my attached form. I was wondering about the merger docs, and obviously didn't fully read your last email as I thought it only had to do with appraisal rights.

245.    Richards then forwarded that letter to J. Rogers, cc'ing S. Rogers, saying:

FYI, I sent this in to Kramer Levin last night. I was wondering when I might get the merger docs, and I obviously didn't read far enough into his email as I thought it only had to do with appraisal rights.

Meanwhile, might you know the timing on sending our stock certificates?

246.    After some initial issues logging into the data room, Richards was finally successful, but didn't see anything different relative to the previous deficiencies.

247.    On May 27, 2022, Richards emailed S. Rogers and J. Rogers, cc'ing Smith, saying:

Jonathan and Steven:

I've been reading the filings and see you're quite busy, but could you please tell me when I might receive copies of the merger documents and my stock certificates?

Thanks, and best of luck with those Cisco rulings.

248.    None of the recipients replied.

249.    On June 17, 2022, Richards forwarded his May 27, 2022 email to the same recipients (i.e., S. Rogers and J. Rogers, with a cc to Smith), asking again:

LEWIS +
LLEWELLYN
LLP

Jonathan and Steven:

Could you please respond to this request? I haven't heard from you in a while, and I'm still awaiting merger documents and stock certificates.

Thank you in advance,

250.    Once again, none of the recipients replied.

251.    On August 18, 2022, Richards's counsel sent a letter to S. Rogers requesting books and records under Section 220 of the Delaware General Corporation Law.  Corporate counsel replied with objections and no data.

**Alsop Louie's and S. Rogers's Obligations Under the Investor Rights Agreement**

252.    The Amended and Restated Voting Agreement from June 2014 is a valid contract signed by, amongst others, Alsop Louie, Steven Rogers, and Richards.

253.    That agreement obligates Alsop Louie to appoint one member to the Board, it obligates S. Rogers in his position as owned of the majority of Key Holder (as defined therein) stock to appoint one member to the Board, and it further obligates S. Rogers, in his position as a majority owner of all stock in Centripetal, to appoint an additional four members to the Board.

254.    Section 6.8 covers any amendments, terminations, or waivers with respect to this contract, and reads (in part):

> **6.8 Consent Required to Amend, Terminate or Waive.** This Agreement may be amended or terminated and the observance of any term hereof may be waived (either generally or in a particular instance and either ***retroactively*** or prospectively) only by a written instrument executed by (a) the Company; (b) the Key Holders holding a majority of the Shares then held by the Key Holders who are then providing services to the Company as directors, officers, employees or consultants; and (c) the holders of a majority of the shares of Common Stock issued or issuable upon conversion of the shares of Preferred Stock held by the Investors (voting as a single class and on an as-converted basis). Notwithstanding the foregoing:
>
> (d) Subsection 1.2(a) of this Agreement shall not be amended or waived without the written consent of Alsop Louie Capital 2, L.P., …
>
> The Company shall give prompt written notice of any amendment, termination or waiver hereunder to any party that did not consent in writing thereto. …

LEWIS +
LLEWELLYN
LLP

255.    Richards has never received any notice of any amendment, termination, or waiver of any of the terms in the Amended and Restated Investor Rights Agreement.

256.    Section 1.2, including Section 1.2(a) reads, in relevant part (emphasis added):

> **1.2 Board Composition.** Each Stockholder *agrees to vote, or cause to be voted*, all Shares owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that at each annual or special meeting of stockholders at which an election of directors is held or pursuant to any written consent of the stockholders, the following persons shall be elected to the Board:
>
> (a)    One person designated by Alsop Louie Capital 2, L.P. (the **"Series A Director"**), which individual shall initially be Gilman Louie, for so long as such Stockholder and its Affiliates continue to own beneficially at least 4,000,000 shares of Common Stock of the Company (including shares of Common Stock issued or issuable upon conversion of Series A Preferred Stock), which number is subject to appropriate adjustment for all stock splits, dividends, combinations, recapitalizations and the like.
>
> (b)    For so long as the Key Holders[18] hold at least a majority of shares of Common Stock (as adjusted for any stock splits, stock dividends, recapitalizations or the like), one individual designated by the holders of a majority of the Shares of Common Stock, which individual shall initially be William Crowell;
>
> (d)    Four individuals not otherwise an Affiliate (as defined below) of the Company or of any Investor, each of whom is mutually acceptable to the other members of the Board, three of whom shall initially be Robert Flores, Robert Gourley and Prescott Winter.

257.    Section 3 ("Voting") of the Amended and Restated Certificate of Incorporation, dated June 12, 2014, contains the following provisions:

> 3.3   Series Preferred Protective Provisions.  At any time when at least 4,000,000 shares of Series Preferred Stock (subject to appropriate adjustment in the event of any Recapitalization) are outstanding, the Corporation shall not, either directly or indirectly by amendment, merger, consolidation or otherwise, do any of the following without (in

---

[18] Schedule B identifies Rogers as owning the vast majority of Key Holder shares.

COMPLAINT
CASE NO.

LEWIS +
LLEWELLYN
LLP

addition to any other vote required by law or the Certificate of Incorporation) the written consent or affirmative vote of the holders of at least a majority of the then outstanding shares of Series Preferred, given in writing or by vote at a meeting, consenting or voting (as the case may be) separately as a class, and any such act or transaction entered into without such consent or vote shall be null and void ab initio, and of no force or effect.

3.3.1 liquidate, dissolve or wind-up the business and affairs of the Corporation, effect any merger or consolidation or any other Deemed Liquidation Event, each a ("Transaction") or consent to any of the foregoing; provided, however, that if both (x) the total consideration payable in such Transaction for each share of Series A Preferred Stock equals or exceeds the applicable Maximum Participation Amount, and (y) the holders of Series A Preferred Stock shall receive such consideration in cash, or securities listed on a national securities exchange that are immediately saleable without limitations or restriction, then the forgoing consent or vote by class shall not be required if the subject Transaction was approved by at least 2/3 of the members of the Board of Directors;

3.3.7 increase or decrease the authorized number of directors constituting the Board of Directors;

SIXTH: Subject to any additional vote required by the Certificate of Incorporation, the number of directors of the Corporation shall be determined in the manner set forth in the Bylaws of the Corporation.

**The Merger Closes, Aided and Abetted by Alsop Louie, Causing Richards Harm**

258.   Centripetal's lawsuit against LookingGlass (an Alsop Louie portfolio company which had Gilman Louie as CEO), Gilman Louie and Alsop Louie (and its unexpected dismissal shortly after being filed) is inexorably intertwined with the sham merger transaction. In Centripetal's March 4, 2022 letter announcing that the transaction had closed on February 22, 2022, Centripetal explicitly stated:

The Company and its counsel engaged in extended negotiations with the largest holder of the Company's preferred stock and its counsel regarding the terms of definitive documentation, including among other things the final form of Merger Agreement, the form of Letter of Transmittal, and a form of Transaction Support Agreement reflecting, among other things, that preferred stockholder's commitment to provide its written consent in favor of the Merger and take certain other actions in connection with the Merger.

51

COMPLAINT
CASE NO.

LEWIS +
LLEWELLYN
LLP

259.   The letter then states:

> The Company's Board of Directors, having previously received a fair market valuation of the Company's equity from Houlihan Lokey, then received in final form, as anticipated, the opinion of a second independent valuation firm, Ocean Tomo, LLC, to the effect that the consideration to be received in the Merger is fair from a financial point of view to the holders of the Company's preferred stock.

260.   Notably absent from this paragraph is the fact that the Houlihan Lokey analysis was explicitly done for the benefit of S. Rogers and J. Rogers – not Centripetal or its minority shareholders – and that it was labeled "Preliminary Draft for Discussion Purposes Only", even though any reasonable actor in Houlihan Lokey's position would have known that Centripetal planned to use the analysis for the buyout.

261.   Yet Defendants stated that only the second opinion, *i.e.*, the Ocean Tomo "fairness opinion," that was "received in final form".  That opinion, however, had so many disclaimers that it was essentially reduced to an analysis that checked Houlihan Lokey's math – with no opinion whatsoever being given on the reasonableness of the inputs to the (draft) analysis, inputs that were provided by the conflicted directors S. Rogers and J. Rogers.  Opinion on the fairness of the conversion of the preferred stock to common stock was also notably absent.

262.   Alsop Louie also proactively participated in the transaction that deprived other preferred shareholders of their preferred status, as the March 4, 2022 letter goes on to state:

> Thereafter, the Company continued negotiations with the largest holder of its preferred stock regarding definitive documentation. On February 18, 2022, the Merger Agreement and related matters were further approved by the Company's Board of Directors. On February 22, 2022, the Merger Agreement was finalized and approved and adopted by the written consent of the holders of a majority of the Company's common and preferred stock voting together as a single class and by the holders of a majority of the Company's preferred stock (which also constituted approval by a majority of the shares of the Company's capital stock not held by members of the Company's management or their affiliates), the Merger Agreement and related documents were executed and delivered, the Certificate of Merger was filed with the Delaware Secretary of State and the Merger became effective.

(Emphasis added.)

263.   Having the majority of the preferred shares outstanding, Alsop Louie's favorable vote

LEWIS +
LLEWELLYN LLP

was necessary for preferred shareholder approval.  Upon information and belief, Alsop Louie accepted the knock-down price and exited its position as a Centripetal shareholder.

264.   Given the flaws and conflicts in Houlihan Lokey's analysis (including its reliance on low-balled projections from S. Rogers and J. Rogers), the only logical reason that Alsop Louie would have accepted an unrealistically low price is that Alsop Loouie received additional compensation – *e.g.*, Centripetal's unexplained dismissal of its lawsuit against Gilman Louie, Alsop Louie, and Alsop Louie portfolio company LookingGlass.

265.   Alsop Louie could always have negotiated for this transaction to be a buyback of those shares that preferred shareholders wanted to sell – thereby avoiding the situation where preferred shareholders who wanted to remain invested in Centripetal could have retained their preferred status.  But they chose not to.  Instead, they aided and abetted Centripetal's management in their breach of fiduciary duty, first by approving an artificially-low buyout price (when they were achieving benefits outside of that price), and then by approving the stripping of the rights of preferred shareholders for no consideration.

266.   In sum, Defendants failed Richards at every turn in the fraudulent squeeze-out merger process, and violated their fiduciary duties owed to all shareholders.  Their conduct in deliberately and repeatedly withholding key information from Richards (while simultaneously discussing the merger with Alsop Louie, in order to coerce its consent), and by agreeing to a merger price that significantly undervalued the Company and was unfair to preferred stockholders like Richards, is egregious and gives rise to liability under state and federal law.

**FIRST CLAIM FOR RELIEF**
**(Breach of Fiduciary Duty under California law—against Centripetal, Steven Rogers, Jonathan Rogers, Paul Barkworth, Gilman Louie, Joseph Addiego, William Crowell, and Cristobel Conde)**

267.   Richards realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

268.   A fiduciary relationship existed between Richards and each of the officers and directors of Centripetal.  As a preferred shareholder, Richards relied on Defendants to comply with their legal obligations and to provide full, accurate, and truthful information to allow Richards to act

LEWIS +
LLEWELLYN
LLP

1  as an informed shareholder and to exercise his rights in connection with the proposed squeeze-out

2  merger.

3      269.    Richards also relied on Defendants to refrain from self-dealing in a manner

4  detrimental to the company and his investments—for example, not forcing him to exchange his

5  preferred shares for much less valuable common stock on a one-to-one basis, based on false,

6  misleading, or omitted information, and to his detriment.

7      270.    Defendants knowingly and voluntarily undertook to act on behalf of and for the

8  benefit of Richards.

9      271.    Defendants owed fiduciary duties to Richards under California common law,

10  including the duty to act with the utmost good faith in the best interests of Richards, and to refrain

11  from self-dealing.  California Corporations Code Section 309 (emphasis added) obligates corporate

12  directors to perform their duties "in good faith, in a manner such director believes to be in the best

13  interests of the corporation ***and its shareholders*** and with such care, including reasonable inquiry, as

14  an ordinarily prudent person would use under similar circumstances."

15      272.    As alleged herein above, Defendants, including Centripetal and all individual

16  defendants, failed to act as reasonable fiduciaries would have acted under the same or similar

17  circumstances.

18      273.    As alleged herein above, Defendants, including Centripetal and all individual

19  defendants, also failed to act in the best interests of Richards, and instead acted in their own self-

20  interest, subordinated Richards's interests to their own interests and engaged in numerous activities

21  to the detriment of Richards, and did so without Richards's knowledge or consent.

22      274.    As alleged herein above, Defendants undertook direct actions and omissions which

23  caused harm to Richards as a shareholder and caused Richards to lose the right to make a fair return

24  on his investment, as he would have if he possessed full and accurate information.

25      275.    Richards was harmed by Defendants' actions and was damaged in an amount to be

26  proved at trial.

27  / /

28  / /

54
COMPLAINT
CASE NO.

LEWIS +
LLEWELLYN
LLP

1
2
3

**SECOND CLAIM FOR RELIEF**
**(Breach of Fiduciary Duty under Delaware law—against Centripetal, Steven Rogers,**
**Jonathan Rogers, Paul Barkworth, Gilman Louie, Joseph Addiego, William Crowell, and**
**Cristobel Conde)**

4
5

276.    Richards realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

6
7
8
9
10

277.    Defendants owed Centripetal's stockholders, including Richards, fiduciary duties of care and loyalty. By virtue of their positions as directors and officers of Centripetal and their exercise of control and ownership over the business and corporate affairs of Centripetal, Defendants Rogers have, and at all relevant times had, the power to control and influence and did control and influence and cause Centripetal to engage in the practices complained of herein.

11
12
13

278.    Defendants were required to: (i) use their ability to control and manage the Company in a fair, just, and equitable manner, and (ii) act in furtherance of the best interests of the Company and its stockholders, including Richards.

14
15

279.    Defendants failed to meet those requirements, causing harm to Richards and damaging him in an amount to be proved at trial.

16
17
18
19
20

280.    Defendants Steven Rogers and Jonathan Rogers also breached their fiduciary duties of loyalty and care by engineering, spearheading, and agreeing to the squeeze-out merger—a transaction without any genuine corporate purpose in which they, as controlling stockholders, stood on both sides—that resulted in a sham merger price, based on a flawed valuation generated through "management inputs" that significantly undervalued the Company.

21
22
23
24
25
26

281.    Defendants Steven Rogers and Jonathan Rogers also breached their fiduciary duties, including their duty of disclosure, by forcing Richards to make a decision on the squeeze-out merger on an extremely abbreviated timeline, while deliberately and repeatedly withholding key information from Richards that would have enabled him to make an informed decision as to whether to vote in favor of the merger, and by providing false or misleading information regarding the purported "fairness" of the transaction.

27
28

LEWIS +
LLEWELLYN
LLP

282.    Moreover, Defendants Steven Rogers and Jonathan Rogers breached their fiduciary duties by engaging in a coercive strategy with Centripetal's largest Preferred Stockholder, Alsop Louie, to secure its vote.

283.    The squeeze-out merger was not entirely fair to Richards and other minority stockholders because it undervalued Centripetal and deprived them of rights without adequate compensation.

284.    By reason of the foregoing acts, practices, and courses of conduct, Defendants have failed to lawfully discharge their fiduciary obligations. As a result of Defendants' breaches of fiduciary duty, Richards has been harmed by virtue of the fact that, among other things, the rights afforded to him as a Series A-2 Preferred Stockholder have been extinguished.

285.    Richards has no adequate remedy at law.

### THIRD CLAIM FOR RELIEF
**(15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5—against all Defendants)**

286.    Richards realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

287.    Section 10(b) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78j(b), makes it unlawful to "use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device in contravention of such rules and regulations as the [SEC] may prescribe."

288.    Rule 10b-5, promulgated by the Securities and Exchange Commission to enforce Section 10(b) and codified at 17 C.F.R. § 240.10b-5, makes it illegal, in connection with the purchase or sale of any security: "(a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made ... not misleading, or[,] (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[.]"

289.    Defendants violated these provisions to Richards's detriment.

290.    Defendants made untrue statements of material, and omitted material facts necessary under the circumstances to keep the statements that were made from being misleading, in connection

LEWIS +
LLEWELLYN LLP

with the purchase and sale of securities—specifically, in connection with the purchase of Richards's preferred shares of Centripetal, and the sale to Richards of Centripetal common stock.

291.   Defendants did so knowingly.

292.   Defendants used or caused the use of an instrumentality of interstate commerce, such as telephones or internet-connected computers, in connection with the purchase and sale of securities—specifically, in connection with the purchase of Richards's preferred shares of Centripetal, and the sale to Richards of Centripetal common stock.

293.   Richards justifiably relied on Defendants' untrue statements of material fact and Defendants' omissions to state necessary material fact, in buying and selling securities.

294.   Defendants' misrepresentations and omissions caused Richards to suffer damages, in an amount to be proved at trial.

**FOURTH CLAIM FOR RELIEF**
**(15 U.S.C. § 78n(3) and 17 C.F.R. § 240.14e-3—against all Defendants)**

295.   Richards realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

296.   Section 14(e) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78n(3), prohibits the making of untrue or misleading statements and the use of fraud, deception, or manipulation in connection with tender offers, requests or invitations for tenders, or solicitation of shareholders with regard to such offers, requests, or invitations.

297.   Rule 14e-3, promulgated by the Securities and Exchange Commission to enforce Section 14(e) and codified at 17 C.F.R. § 240.14e-3, makes it illegal for persons in possession of material, nonpublic information relating to a tender offer to trade in securities affected by the offer.

298.   As alleged in detail above, Defendants provided information in connection with the squeeze-out merger, which Defendants knew or recklessly failed to discover contained material omissions and misstatements.

299.   During the relevant time period, Defendants disseminated the false and misleading statements in support of the squeeze-out merger.  Defendants knew or recklessly disregarded that those statements failed to disclose material facts necessary in order to make the statements made, in

LEWIS +
LLEWELLYN LLP

light of the circumstances under which they were made, not misleading.

300.     The statements in support of the merger were prepared, reviewed, and/or disseminated by Defendants.  They misrepresented and/or omitted material facts, including material information about the consideration offered to stockholders, the intrinsic value of Centripetal, and potential conflicts of interest faced by certain Defendants.

301.     In so doing, Defendants made untrue statements of material facts and omitted material facts necessary to make the statements that were made not misleading in violation of Section 14(e) of the Exchange Act.  By virtue of their positions within Centripetal and/or roles in the process and in the preparation of the materials in support of the squeeze-out merger, Defendants were aware of this information and their obligation to disclose this information.

302.     The omissions and incomplete and misleading statements are material in that a reasonable stockholder would consider them important in deciding whether to agree to the squeeze-out merger.  In addition, a reasonable investor would view the information identified above which was misleading or omitted entirely as altering the "total mix" of information made available to stockholders.

303.     Defendants knowingly or with deliberate recklessness omitted the material information identified above, causing certain statements therein to be materially incomplete and therefore misleading.

304.     The misrepresentations and omissions were material to Richards.

305.     Richards justifiably relied on Defendants' untrue statements of material fact and Defendants' omissions to state necessary material fact, in connection with the squeeze-out merger.

306.     Defendants' misrepresentations and omissions caused Richards to suffer damages, in an amount to be proved at trial.

**FIFTH CLAIM FOR RELIEF**
**(Constructive Fraud—against all Defendants)**

307.     Richards realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

308.     A fiduciary relationship existed between Richards and Defendants.

LEWIS +
LLEWELLYN LLP

309.    Richards entrusted Centripetal and its officers and directors, including those named herein as Defendants, with his investment money; Richards relied on Defendants to comply with their legal obligations and to provide full, accurate, and truthful information to allow Richards to act as an informed shareholder and to exercise his rights in connection with the squeeze-out merger.

310.    Defendants knowingly and voluntarily undertook to act on behalf of and for the benefit of Richards.

311.    Defendants owed fiduciary duties to Richards, including the duty to act with the utmost good faith in the best interests of Richards.

312.    As alleged herein above, Defendants possessed information material to Richards's interests relating to the finances of Centripetal, and specifically relating to the squeeze-out merger.

313.    As alleged herein above, Defendants knew or should have known that this information was material to Richards's interest.

314.    As alleged herein above, Defendants failed to disclose this material information to Richards.

315.    Richards would have acted differently and would not have been damaged if Defendants had not breached their duties, had not made false representations, and had not omitted to inform Richards of material facts known to them, or material facts they should have known.

316.    Richards was harmed by Defendants' actions and was damaged in an amount to be proved at trial.

317.    Defendants' acts and omissions were substantial factors in causing Richards harm.

**SIXTH CLAIM FOR RELIEF**
**(Concealment—against all Defendants)**

318.    Richards realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

319.    A fiduciary relationship existed between Richards and each of the Defendants. Defendants owed fiduciary duties to Richards as a preferred shareholder, including the duty to act with the utmost good faith in the best interests of Richards.

LEWIS +
LLEWELLYN
LLP

320.   Richards entrusted Centripetal and its officers and directors, including those named herein as Defendants, with his investment money; Richards relied on Defendants to comply with their legal obligations and to provide full, accurate, and truthful information to allow Richards to act as an informed investor and to exercise his rights as guaranteed by the Notes.

321.   Defendants knowingly and voluntarily undertook to act on behalf of and for the benefit of Richards.

322.   As alleged herein above, Defendants had exclusive knowledge of material facts and intentionally concealed, suppressed, and failed to disclose facts to Richards relating to the squeeze-out merger, which harmed Richards's interests and subordinated his interests to the interests of Defendants.

323.   As a result, Richards did not know of material facts relating to his preferred shares, the finances of Centripetal, and specifically the squeeze-out merger, as well as Defendants' own actions that harmed Richards's interests and subordinated his interests to the interests of Defendants.

324.   As alleged herein above, had Defendants disclosed the concealed facts, Richards would have acted differently and would not have been harmed.

325.   Richards was harmed by Defendants' actions and was damaged in an amount to be proved at trial.

326.   Defendants' acts and omissions were substantial factors in causing Richards harm.

**SEVENTH CLAIM FOR RELIEF**
**(Negligent Misrepresentation—against all Defendants)**

327.   Richards realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

328.   As alleged herein above, Defendants made representations to Richards regarding his investments with Centripetal, and the company's finances, and the squeeze-out merger.

329.   As alleged herein above, those representations were false.

330.   Defendants had no reasonable ground for believing the representations to be true when they were made.

331.   Defendants intended Richards to rely on their misrepresentations.

COMPLAINT
CASE NO.

LEWIS +
LLEWELLYN LLP

1    332.    Richards reasonably relied on Defendants' misrepresentations.

2    333.    As alleged herein above, Richards would have acted differently and would not have

3    been harmed, but for Defendants' misrepresentations.

4    334.    Richards was harmed by Defendants' misrepresentations and was damaged in an

5    amount to be proved at trial.

6    335.    Defendants' misrepresentations, and Richards's reliance thereupon, were substantial

7    factors in causing Richards harm.

8                           **EIGHTH CLAIM FOR RELIEF**
                **(Fraud – Intentional Misrepresentation—against all Defendants)**
9

10   336.    Richards realleges and incorporates by reference the allegations set forth in each of

11   the preceding paragraphs as though fully set forth herein.

12   337.    As alleged herein above, Defendants made representations to Richards regarding his

13   investments with Centripetal, the company's finances, and the squeeze-out merger.

14   338.    As alleged herein above, those representations were false.

15   339.    Defendants knew the representations were false when made, and/or they were made

16   recklessly and without regard for their truth.

17   340.    Defendants intended Richards to rely on their misrepresentations.

18   341.    Richards reasonably relied on Defendants' misrepresentations.

19   342.    As alleged herein above, Richards would have acted differently and would not have

20   been harmed, but for Defendants' misrepresentations.

21   343.    Richards was harmed by Defendants' misrepresentations and was damaged in an

22   amount to be proved at trial.

23   344.    Defendants' misrepresentations, and Richards's reliance thereupon, were substantial

24   factors in causing Richards harm.

25   345.    Defendants' conduct as alleged herein, was unconscionable, fraudulent, oppressive,

26   malicious and done intentionally or in conscious disregard of Richards's rights and in order to

27   further their own financial self-interest at Richards's expense so as to justify an award of punitive

28   damages.

LEWIS +
LLEWELLYN LLP

**NINTH CLAIM FOR RELIEF**
**(Fraudulent Inducement—against all Defendants)**

346.    Richards realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

347.    Defendants fraudulently induced Richards to exchange his preferred shares of Centripetal for common stock in the company, to the detriment of Richards.

348.    Defendants' representations in connection with the squeeze-out merger, as detailed above, were false.

349.    Defendants knew those representations were false, or they were reckless about the truth of those representations.

350.    Defendants intended for Richards to rely on the representations in Paragraph 5a.

351.    Richards did in fact rely on Defendants' representations.

352.    Richards was harmed, and continues to suffer harm as a result of the fraudulently supported squeeze-out merger.

353.    Had Defendants not made the fraudulent misrepresentations, Richards would have acted differently and not suffered harm.

354.    Richards was harmed by Defendants' misrepresentations and was damaged in an amount to be proved at trial.

355.    Defendants' misrepresentations, and Richards's reliance thereupon, were substantial factors in causing Richards harm.

356.    Defendants' conduct as alleged herein, was unconscionable, fraudulent, oppressive, malicious and done intentionally or in conscious disregard of Richards's rights and in order to further their own financial self-interest at Richards's expense so as to justify an award of punitive damages.

/ /

/ /

/ /

/ /

COMPLAINT
CASE NO.

LEWIS +
LLEWELLYN
LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TENTH CLAIM FOR RELIEF**
**(Unjust Enrichment—against Centripetal, Alsop Louie, Steven Rogers, Jonathan Rogers, Paul Barkworth, Gilman Louie, Joseph Addiego, William Crowell, and Cristobel Conde)**

357.    Richards realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

358.    Richards conferred a benefit on Defendants.  He purchased preferred shares of stock, on the condition that he receive the benefits to be conferred upon a preferred shareholder.

359.    By denying Richards the benefit of his purchased preferred shares, Defendants unjustly retained the benefit of Richards's funds.  As a result of their unlawful acts and omissions, Defendants received financial and economic benefit at the expense of Richards.

360.    Defendants' retention of that economic benefit at the expense of Richards is unjust.

361.    As a direct and proximate result of the allegations above, Defendants have been unjustly enriched at the expense of Richards in an amount to be proved at trial.

362.    Richards reasonably relied on Defendants' misrepresentations.

363.    As alleged herein above, Richards would have acted differently and would not have been harmed, but for Defendants' misrepresentations.

364.    Richards was harmed by Defendants' misrepresentations and was damaged in an amount to be proved at trial.

365.    Defendants' misrepresentations, and Richards's reliance thereupon, were substantial factors in causing Richards harm.

366.    Defendants' conduct as alleged herein, was unconscionable, fraudulent, oppressive, malicious and done intentionally or in conscious disregard of Richards's rights and in order to further their own financial self-interest at Richards's expense so as to justify an award of punitive damages.

/ /

/ /

/ /

/ /

LEWIS +
LLEWELLYN
LLP

**ELEVENTH CLAIM FOR RELIEF**
**(Violation of Corporations Code § 25401—against Centripetal, Steven Rogers, Jonathan Rogers, Paul Barkworth, Gilman Louie, Joseph Addiego, William Crowell, and Cristobel Conde)**

367.   Richards realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

368.   As alleged herein above, Defendants made numerous untrue statements of material fact and omitted to state material facts in inducing Richards to alienate his preferred shares in exchange for common stock.

369.   Defendants' investments in Centripetal included purchases of securities.

370.   Defendants intended Plaintiff to rely on their representations and intended to induce Richards to purchase the securities, retain his investments in Centripetal, and agree to the squeeze-out merger.

371.   Richards reasonably relied on the representations in exchanging his preferred shares for common stock.

372.   Richards was harmed by Defendants' misrepresentations and was damaged in an amount to be proved at trial.

373.   Defendants' misrepresentations, and Richards's reliance thereupon, were substantial factors in causing Richards harm.

374.   Defendants' conduct as alleged herein, was unconscionable, fraudulent, oppressive, malicious and done intentionally or in conscious disregard of Richards's rights and in order to further their own financial self-interest at Richards's expense so as to justify an award of punitive damages.

**TWELFTH CLAIM FOR RELIEF**
**(Violation of Corporations Code § 25403—against Individual Defendants)**

375.   Richards realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

LEWIS +
LLEWELLYN LLP

376.   As alleged herein above, Defendants made numerous untrue statements of material fact and omitted to state material facts in connection with the squeeze-out merger, in violation of California Corporations Code Section 25401.

377.   Individual Defendants Steven Rogers, Jonathan Rogers, Paul Barkworth, Gilman Louie, Joseph Addiego, William Crowell, and Cristobel Conde are or were control persons of Centripetal.

378.   California Corporations Code § 25403 imposes liability on persons who, with knowledge, directly or indirectly control an entity liable under Corporations Code § 25401.

379.   Individual Defendants are liable for the harm to Richards.

380.   Defendants' conduct as alleged herein, was unconscionable, fraudulent, oppressive, malicious and done intentionally or in conscious disregard of Richards's rights and in order to further their own financial self-interest at Richards's expense so as to justify an award of punitive damages.

### THIRTEENTH CLAIM FOR RELIEF
### (Violation of Corporations Code § 25504.1—against all Defendants)

381.   Richards realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

382.   California Corporations Code § 25504.1 imposes liability jointly and severally upon any person who materially assists in any violation of Corporations Code Section 25401.

383.   As alleged herein above, each Defendant materially assisted the other Defendants in making numerous untrue statements of material fact and omitting to state material facts, to induce Richards to alienate his preferred shares in exchange for common stock.

384.   Defendants' investments in Centripetal included purchases of securities.

385.   Defendants intended Plaintiff to rely on their representations and intended to induce Richards to purchase the securities, retain his investments in Centripetal, and agree to the squeeze-out merger.

386.   Richards reasonably relied on the representations in exchanging his preferred shares for common stock.

LEWIS +
LLEWELLYN
LLP

387.     Richards was harmed by Defendants' misrepresentations and was damaged in an amount to be proved at trial.

388.     Defendants' misrepresentations, and Richards's reliance thereupon, were substantial factors in causing Richards harm.

### FOURTEENTH CLAIM FOR RELIEF
**(Violation of Business and Professions Code § 17200—against Centripetal, Alsop Louie, Houlihan Lokey, and Ocean Tomo)**

389.     Richards realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

390.     California's Unfair Competition Law, Business and Professions Code § 17200, prohibits any unlawful, unfair or fraudulent business act or practice.

391.     As detailed above, Defendants Centripetal, Alsop Louie, Houlihan Lokey, and Ocean Tomo engaged in unfair business practices in connection with the squeeze-out merger.

392.     The conduct of Defendants Centripetal, Alsop Louie, Houlihan Lokey, and Ocean Tomo in providing false or misleading information, omitting material information, and conspiring to deprive Richards of the value of his preferred shares of Centripetal was immoral, oppressive, unscrupulous and substantially injurious.

393.     As a result of the above unfair business practices, Richards suffered damages in an amount to be proved at trial.

### FIFTEENTH CLAIM FOR RELIEF
**(Violation of Delaware General Corporations Law §§ 144, 228, 251, and 262—against Centripetal, Alsop Louie, Steven Rogers, and Jonathan Rogers)**

394.     Richards realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs as though fully set forth herein.

395.     Because of the conflicts of interest, self-dealing and other malfeasance detailed above, Defendants failed to comply with the Delaware General Corporations Law provisions requiring timely statutory notice to shareholders (8 Del. C. § 262), sufficient written consent by shareholders (8 Del. C. § 228), disclosure of material facts concerning the directors' relationships and interests in the merger transaction (8 Del. C. § 144(a)(2)), and disclosure of who received, or

66

COMPLAINT
CASE NO.

LEWIS +
LLEWELLYN
LLP

would receive, consideration in connection with the merger (8 Del. C. § 251).

396.    Richards has suffered harm as a direct result of these violations.

397.    Because the Merger Agreement fails to comply with Delaware law, it is null and void.

398.    Richards has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Richards prays for relief as set forth below:

1.    Declare that the Defendants violated the law;

2.    Declare that the Merger and Merger Agreement is null and void, and disgorge Defendants of any benefits received therewith;

3.    Award Richards such monetary and equitable relief against Defendants for their violations of law and breaches of fiduciary duty, and for the lack of entire fairness of the merger transaction, as the Court deems just and equitable;

4.    Enter a quasi-appraisal monetary judgment with interest against Defendants and in favor of Richards in at least the amount of the difference between the merger consideration and Centripetal's fair value at the time of the merger;

5.    Award fees, expenses and costs to Plaintiff and Plaintiff's counsel; and

6.    Grant such other and further relief as the Court deems just and proper.

Dated:  February 21, 2024

LEWIS & LLEWELLYN LLP

*s/ Kenneth M. Walczak*

By:  Marc R. Lewis
     Kenneth M. Walczak

Attorneys for Plaintiff Albert Richards